# State of Tennessee
## IN THE CHANCERY COURT FOR HAMILTON COUNTY

Jane Doe, John Doe, Jack Doe, and Janet Doe,
individually, on behalf of themselves, and all
others similarly situated

**PLAINTIFFS**

VS.

DOCKET NO. 23-0730

Erlanger Health d/b/a Erlanger Health Systems

**DEFENDANT**

## SUMMONS

TO DEFENDANT: _____ Erlanger Health d/b/a Erlanger Health System _____

WHOSE ADDRESS IS _____ Serve Registered Agent _____

_____ National Registered Agents, Inc., 300 Montvue Road, Knoxville, TN 37919-5546 _____

OTHER SERVICE INFORMATION _____ Serve via certified mail _____

You are summoned and required to Answer and make defense to a Complaint herewith served upon you. Your Answer to the Complaint must be filed and served upon plaintiff's attorney on or before thirty (30) days after service of this Summons and Complaint upon you, exclusive of the day of service. Your Answer must be filed in the OFFICE OF THE CLERK & MASTER, 625 Georgia Avenue, Room 300 Courthouse, Chattanooga, Tennessee 37402. You are also required to serve a copy of your Answer upon the plaintiff's attorney, or the *pro se* plaintiff as set out below. If you fail to do so, judgment by default will be taken against you for the relief demanded in the Complaint.

ISSUED & ATTESTED this 1 day of November , 20 23.

ROBIN L. MILLER, CLERK & MASTER

By: _____ (signature) _____

DEPUTY CLERK & MASTER

| | |
|---|---|
| J. Gerard Stranch, IV | 23045 |
| Plaintiff's Attorney or Plaintiff if no attorney (*pro se*) | BPR# |

Stranch, Jennings & Garvey PLLC.
Address

223 Rosa L. Parks Ave.

Nashville, TN 37203

(615) 254-8801          (615) 255-5419
Tel. No.                       Fax No.

**A TRUE COPY**
ROBIN L. MILLER, Clerk & Master
Chancery Court, Hamilton County, Tennessee

This 1 day of November 20 23

By: _____ (signature) _____ DC&M

**NOTICE TO DEFENDANT(S)**

Tennessee Code Annotated § 26-2-103 provides a $10,000.00 personal property exemption from execution or seizure to satisfy a judgment. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the Clerk & Master. The list may be filed at any time and may be changed by you thereafter as necessary; however unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for yourself and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you, would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer.

# SUMMONS RETURN

I received this summons on _____. I certify and return that on _____, I
(Date)                                                        (Date)

☐ served this summons and a complaint on defendant, _____
(Printed Name of Defendant)

in the following manner:

_____

_____

_____

☐ failed to serve this summons within ninety (90) days after its issuance because:

_____

_____

_____

_____          _____
Process Server Name (Printed)              Process Server Signature

_____
Address

_____

_____

# IN THE CHANCERY COURT FOR THE ELEVENTH JUDICIAL DISTRICT
## HAMILTON COUNTY, TENNESSEE

JANE DOE, JOHN DOE, JACK DOE,  )
and JANET DOE, individually, on  )
behalf of themselves, and all others  )
similarly situated,  )
    )
    Plaintiffs,  )
    )
v.  )   Case No: **23-0730**
    )
ERLANGER HEALTH d/b/a  )
ERLANGER HEALTH SYSTEM  )
    )
    Defendant  )

## CLASS ACTION COMPLAINT AND JURY DEMAND

Plaintiffs, JANE DOE, JOHN DOE, JACK DOE, and JANET DOE, Individually, and on behalf of all others similarly situated (hereinafter "Plaintiffs") bring this Class Action Complaint against Defendant, ERLANGER HEALTH d/b/a ERLANGER HEALTH SYSTEM (hereinafter "Erlanger" or "Defendant"), and allege, upon personal knowledge as to their own actions, and upon information and belief as to all other matters, as follows:

## INTRODUCTION

1.    Plaintiffs bring this class action to address Defendant's improper practice of disclosing the confidential Personally Identifying Information ("PII")[1] and/or Protected Health Information ("PHI")[2] (collectively referred to as "Private Information") of Plaintiffs and the

---

[1] The Federal Trade Commission defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 17 C.F.R. § 248.201(b)(8).

[2] Under the Health Insurance Portability and Accountability Act, 42 U.S.C. § 1320d *et seq.*, and its implementing regulations ("HIPAA"), "protected health information" is defined as individually identifiable information relating to the past, present, or future health status of an individual that is created, collected, or transmitted, or maintained by a HIPAA-covered entity in relation to the provision of

2023 NOV -1 AM 9: 05

1  FILED
HAMILTON CO CLERK & MASTER

proposed Class Members to third parties, including Meta Platforms, Inc. d/b/a Meta ("Facebook" or "Meta"),[3] and potentially others ("the Disclosure") via tracking technologies used on its website.

2. The Office for Civil Rights ("OCR") at the U.S. Department of Health and Human Services ("HHS") and the Federal Trade Commission ("FTC") warn about the "serious privacy and security risks related to the use of online tracking technologies" present on websites or online platforms, such as Defendant's, that "impermissibly disclos[e] consumers' sensitive personal health information to third parties."[4] OCR and FTC agree that such tracking technologies, like those present on Defendant's website, "can track a user's online activities" and "gather identifiable information about users as they interact with a website or mobile app, often in ways which are not avoidable by and largely unknown to users."[5] OCR and FTC warn that "[i]mpermissible disclosures of an individual's personal health information to third parties may result in a wide range of harms to an individual or others. Such disclosures can reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, where an individual seeks medical treatment, and more. In addition, impermissible disclosures of personal health information may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation,

healthcare, payment for healthcare services, or use in healthcare operations. 45 C.F.R. § 160.103 *Protected health information.* "Business Health information such as diagnoses, treatment information, medical test results, and prescription information are considered protected health information under HIPAA, as are national identification numbers and demographic information such as birth dates, gender, ethnicity, and contact and emergency contact information. *Summary of the HIPAA Privacy Rule*, DEP'T FOR HEALTH & HUM. SERVS., https://www.hhs.gov/hipaa/for-professionals/privacy/laws-regulations/index.html (last accessed Apr. 16, 2020). Erlanger is clearly a "covered entity" and some of the data compromised in the Disclosure that this action arises out of is "protected health information," subject to HIPAA.

[3] Facebook changed its name from Facebook, Inc. to Meta Platforms, Inc. in October 2021. Plaintiffs's reference to both "Facebook" and "Meta" throughout this complaint refer to the same company.

[4] Re: Use of Online Tracking Technologies, U.S. Dep't of Health & Human Services (July 20, 2023), available at https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf (last accessed October 12, 2023), **attached as Exhibit A.**

[5] *Id.*

health, or physical safety of the individual or to others."[6]

3.      Information about a person's physical and mental health is among the most confidential and sensitive information in our society, and the mishandling of medical information can have serious consequences, including discrimination in the workplace or denial of insurance coverage. If people do not trust that their medical information will be kept private, they may be less likely to seek medical treatment, which can lead to more serious health problems down the road. In addition, protecting medical information and making sure it is kept confidential and not disclosed to anyone other than the person's medical provider is necessary to maintain public trust in the healthcare system as a whole.

4.      Recognizing these facts, and in order to implement requirements of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), HHS has established "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") governing how health care providers must safeguard and protect Private Information. Under the HIPAA Privacy Rule, no health care provider can disclose a person's personally identifiable protected health information to a third party without express written authorization.

5.      Defendant is "a nationally-acclaimed, multi-hospital system" headquartered in Chattanooga, Tennessee.[7]

6.      Despite its unique position as a trusted healthcare provider, Erlanger knowingly configured and implemented into its website, https://www.erlanger.org/ (the "Website") code-based tracking devices known as "pixels" (also referred to as "trackers" or "tracking technologies"), which collected and transmitted patients' Private Information to Facebook and

---

[6] Re: Use of Online Tracking Technologies, U.S. Dep't of Health & Human Services, (July 20, 2023) **Exhibit A.**
[7] https://www.erlanger.org/about-us/about-us (last accessed October 19, 2023).

other third parties, without patients' knowledge or authorization.

7. Defendant encourages patients to use its Website, along with its various web-based tools and services (collectively, the "Online Platforms"), to learn about Erlanger via its main website page,[8] find doctors,[9] search for information on medical conditions,[10] find medical services,[11] access a patient portal via a pre-portal page,[12] and more.

8. When Plaintiffs and Class Members used Defendant's Website and Online Platforms, they thought they were communicating exclusively with their trusted healthcare provider. Unbeknownst to them, Defendant embedded pixels from Facebook, and others into its Website and Online Platforms, surreptitiously forcing Plaintiffs and Class Members to transmit intimate details about their medical treatment to third parties without their consent.

9. A pixel (also referred to as a "tracker" or "tracking technology") is a snippet of code embedded into a website that tracks information about its visitors and their website interactions.[13] When a person visits a website with an embedded pixel, the pixel tracks "events" (i.e., user interactions with the site), such as pages viewed, buttons clicked, and information submitted.[14] Then, the pixel transmits the event information back to the website server and to third parties, where it can be combined with other data and used for marketing.[15]

10. Among the trackers Defendant embedded into its Website is the Facebook Pixel (also referred to as the "Meta Pixel" or "Pixel"). By default, the Meta Pixel tracks information

---

[8] https://www.erlanger.org/ (last accessed October 23, 2023).
[9] https://www.erlanger.org/find-a-doctor/find-a-doctor (last accessed October 23, 2023).
[10] See, e.g., search for "chest pain," https://www.erlanger.org/search/search?search=chest%20pain (last accessed October 23, 2023).
[11] https://www.erlanger.org/medical-services/services-a-z-list (last accessed October 23, 2023).
[12] https://www.erlanger.org/medical-services/patient-portals (last accessed October 23, 2023).
[13] See Meta Pixel, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/ (last accessed Mar. 19, 2023).
[14] See Conversion Tracking, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking (last visited May 22, 2023).
[15] Id.

about a visitor's device, including their IP address, and the pages viewed.[16] When configured to do so, the Meta Pixel can track much more, including a visitor's search terms, button clicks, and form submissions.[17] Additionally, the Meta Pixel can link a visitor's website interactions with an individual's unique and persistent Facebook ID ("FID"), allowing a user's health information to be linked with their Facebook profile.[18]

11.     Operating as designed and as implemented by Defendant, the Meta Pixel allowed Defendant to unlawfully disclose Plaintiffs and Class Members' Private Health Information alongside identifying details to Facebook. By installing the Meta Pixel on its Website, Defendant effectively planted a bug on Plaintiffs' and Class Members' web browsers and compelled them to disclose Private Information and confidential communications to Facebook without their authorization or knowledge.

12.     Facebook encourages and recommends use of its Conversions Application Programming Interface ("CAPI") alongside use of the Meta Pixel.[19]

13.     Unlike the Meta Pixel, which co-opts a website user's browser and forces it to transmit information to Facebook in addition to the website owner, CAPI does not cause the user's browser to transmit information directly to Facebook. Instead, CAPI tracks the user's website interaction, including Private Information, records and stores that information on the website

---

[16] *See* Get Started, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/get-started (last visited May 22, 2023).

[17] *See* Conversion Tracking, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking (last visited May 22, 2023).

[18] The Meta Pixel forces the website user to share the user's FID for easy tracking via the "cookie" Facebook stores every time someone accesses their Facebook account from the same web browser. "Cookies are small files of information that a web server generates and sends to a web browser." "Cookies help inform websites about the user, enabling the websites to personalize the user experience." What are Cookies?, https://www.cloudflare.com/learning/privacy/what-are-cookies/ (last visited Jan. 27, 2023).

[19] "CAPI works with your Meta Pixel to help improve the performance and measurement of your Facebook ad campaigns." *See* Samir El Kamouny, How to Implement Facebook Conversions API (In Shopify), FETCH & FUNNEL https://www.fetchfunnel.com/how-to-implement-facebook-conversions-api-in-shopify/ (last visited Jan. 25, 2023).

owner's servers, and then transmits the data to Facebook from the website owner's servers.[20, 21]

14. Indeed, Facebook markets CAPI as a "better measure [of] ad performance and attribution across your customer's full journey, from discovery to conversion. This helps you better understand how digital advertising impacts both online and offline results."[22]

15. Because CAPI is located on the website owner's servers and is not a bug planted onto the website user's browser, it allows website owners like Defendant to circumvent any ad blockers or other denials of consent by the website user that would prevent the Meta Pixel from sending website users' Private Information to Facebook directly.

16. Defendant utilized data from these trackers to market its services and bolster its profits. Meta Pixel and CAPI are routinely used to target specific customers by utilizing data to build profiles for the purposes of retargeting and future marketing. Facebook also uses Plaintiffs' and Class Members' Private Information to create targeted advertisements based on the medical conditions and other information disclosed to Defendant.

17. The information that Defendant's Meta Pixel and possibly CAPI sent to Facebook can include the Private Information that Plaintiffs and Class Members submitted to Defendant's Website, including, for example, the parameters of their doctor searches, the contents of their search queries, their searches for medical information and services, their pre-portal activity, and, more, including the pages they visited, and the buttons that they clicked.

18. Such information allows a third party (e.g., Facebook) to know that a specific

---

[20] What is the Facebook Conversion API and How to Use It, REVEALBOT BLOG, https://revealbot.com/blog/facebook-conversions-api/ (last updated May 20, 2022).

[21] "Server events are linked to a dataset ID and are processed like events sent via the Meta Pixel…. This means that server events may be used in measurement, reporting, or optimization in a similar way as other connection channels." Conversions API, META FOR DEVELOPERS, https://developers.facebook.com/docs/marketing-api/conversions-api (last visited May 15, 2023).

[22] About Conversions API, META FOR DEVELOPERS, https://www.facebook.com/business/help/2041148702652965 (last visited May 15, 2023).

patient was seeking confidential medical care. Facebook, in turn, sells Plaintiffs' and Class Members' Private Information to third-party marketers, who then geotarget Plaintiffs' and Class Members' Facebook pages based on communications obtained via the Meta Pixel and CAPI. Facebook and any third-party purchasers of Plaintiffs' and Class Members' Private Information also could reasonably infer from the data that a specific patient was being treated for a specific type of medical condition, such as cancer, pregnancy, dementia, or HIV.

19.     In addition to the Facebook tracker and CAPI, on information and belief, Defendant installed other tracking technology which operate similarly to the Meta Pixel and transmit a website user's Private Information to other third parties.

20.     Healthcare patients simply do not anticipate that their trusted healthcare provider will send Personal Health Information or other confidential medical information collected via its webpages to a hidden third party—let alone Facebook, which has a sordid history of privacy violations in pursuit of ever-increasing advertising revenue—without the patients' consent.

21.     Neither Plaintiffs nor any Class Member signed a written authorization permitting Defendant to send their Private Information to Facebook, or any other third parties uninvolved in their treatment.

22.     Despite willfully and intentionally incorporating tracking technology, including the Meta Pixel, potentially CAPI, and other tracking technology, into its Website and servers, Erlanger has never disclosed to Plaintiffs or Class Members that it shared their sensitive and confidential communications and Private Information with third parties including Facebook, and possibly others.

23.     ·Defendant further made express and implied promises to protect Plaintiffs' and Class Members' Private Information and maintain the privacy and confidentiality of

communications that patients exchanged with Defendant, including in its privacy policies and elsewhere.

24. Defendant owed common law, statutory, and regulatory duties to keep Plaintiffs' and Class Members' communications and Private Information safe, secure, and confidential.

25. Upon information and belief, Erlanger utilized the Meta Pixel and other tracker data to improve and to save costs on its marketing campaigns, improve its data analytics, attract new patients, and generate sales.

26. Furthermore, by obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' Private Information, Defendant assumed legal and equitable duties to those individuals to protect and to safeguard that information from unauthorized disclosure.

27. Defendant breached its statutory and common law obligations to Plaintiffs and Class Members by, *inter alia,*: (i) failing to adequately review its marketing programs and web based technology to ensure the hospital Website was safe and secure; (ii) failing to remove or disengage technology that was known and designed to share web-users' information; (iii) aiding, agreeing, and conspiring with third parties to intercept communications sent and received by Plaintiffs and Class Members; (iv) failing to obtain the written consent of Plaintiffs and Class Members to disclose their Private Information to Facebook and others; (v) failing to protect Private Information and take steps to block the transmission of Plaintiffs' and Class Members' Private Information through the use of Meta Pixel and other tracking technology; (vi) failing to warn Plaintiffs and Class Members; and (vii) otherwise failing to design and monitor its Website to maintain the confidentiality and integrity of patient Private Information.

28. Plaintiffs seek to remedy these harms and brings causes of action for (I) Negligence; (II) Negligence *Per Se*; (III) Invasion of Privacy; (IV) Breach of Implied Contract; (V) Unjust Enrichment; (VI) Breach of Fiduciary Duty; (VII) Violation of the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101, *et seq.*, and (VIII) Violation of Tenn. Code Ann. § 39-13-601, *et seq.*

## PARTIES

29. Plaintiff, JANE DOE, is a natural person and a resident and citizen of Tennessee where she intends to remain, with a principal residence in Chattanooga, Hamilton County, Tennessee. She is a patient of Erlanger at its Gun Barrell Road location and a victim of Defendant's unauthorized Disclosure of Private Information.

30. Plaintiff, JOHN DOE, is a natural person and a resident and citizen of Tennessee where he intends to remain, with a principal residence in Chattanooga, Hamilton County, Tennessee. He is a patient of Erlanger and a victim of Defendant's unauthorized Disclosure of Private Information.

31. Plaintiff, JACK DOE, is a natural person and a resident and citizen of Tennessee where he intends to remain, with a principal residence in Chattanooga, Hamilton County, Tennessee. He is a patient of Erlanger at Baroness Hospital and a victim of Defendant's unauthorized Disclosure of Private Information.

32. Plaintiff, JANET DOE, is a natural person and a resident and citizen of Tennessee where she intends to remain, with a principal residence in McDonald, Bradley County, Tennessee. She is a patient of Erlanger and a victim of Defendant's unauthorized Disclosure of Private Information.

33. Defendant, ERLANGER HEALTH ("Erlanger" or "Defendant") is a non-profit corporation organized and existing under the laws of the State of Tennessee, with a principal place of business at 975 East 3rd Street, Chattanooga, Tennessee 37403 in Hamilton County.

34. Defendant's Registered Agent for Service of Process is National Registered Agents, Inc., 300 Montvue Road, Knoxville, Tennessee 37919-5546.

## JURISDICTION & VENUE

35. This Court has general jurisdiction over this action pursuant to Tenn. Code Ann. § 16-10-101.

36. This Court has personal jurisdiction over Defendant because Erlanger operates and maintains a principal place of business in Hamilton County, and the conduct at-issue occurred in this County.

37. Venue is proper in Hamilton County in this cause under Tenn. Code Ann. § 20-4-101 because the cause of action arose in this County and Defendant maintains a principal office in this County.

## COMMON FACTUAL ALLEGATIONS

### A. Background

38. Since 1889, Erlanger has bas been serving residents of East Tennessee, North Georgia, North Alabama and West North Carolina through its "six hospitals, six emergency rooms, three community health centers, and several physician practices."[23]

39. Defendant holds itself out as having core values, including "accountability," stating that it is "…responsible for our words and our actions. We strive to fulfill all of our promises and to meet the expectations of those who trust us for their care."[24]

---

[23] https://www.erlanger.org/locations/erlanger-locations (last accessed October 19, 2023).
[24] https://www.erlanger.org/about-us/about-us (last accessed October 23, 2023).

40.     Defendant does business as Erlanger Health System with its principal campus, Erlanger Baroness Hospital, located "just east of Downtown Chattanooga."[25] In addition to its Downtown campus, Erlanger offers services from 5 additional locations: Children's Hospital at Erlanger, 910 Blackford Street, Chattanooga, TN 37403; Erlanger North Hospital, 632 Morrison Springs Road, Chattanooga, TN 37415; Erlanger East Hospital, 1751 Gunbarrel Road, Chattanooga, TN 37421; Erlanger Bledsoe Hospital, 71 Wheelertown Avenue, Pikeville, TN 37367; and Erlanger Western Carolina Hospital, 3990 E. US Hwy. 64 Alt., Murphy, NC 28906.[26] In addition to their chief locations, Erlanger "runs three community health centers, 25 Primary Care locations, eight ExpressCare walk-in centers, and numerous specialty clinics."[27]

41.     Erlanger provides vital services for "more than 1,000,000 people" each year. Not only does Erlanger provide services for a substantial number of residents in Tennessee, Georgia, North Carolina, and Alabama, but Erlanger "[i]s [also] the tri-state region's only Level I Trauma Center."[28]

42.     Erlanger offers all treatments typically available at Level I Trauma Centers. Defendant's hospital system offers a wide variety of treatments in a number of different fields, including Bariatrics, Cancer/Oncology, Cardiology, Dermatology, Gastroenterology, Neurology, Orthopaedics, Pediatrics, Urology, Nephrology, Gynecology and Obstetrics, Physical Therapy, Psychiatry, Surgery, Trauma Care, and Urgent Care, to name but a few.[29]

43.     Defendant is a major lifeline for residents in east Tennessee, north Georgia, north Alabama, and west North Carolina

---

[25] https://www.erlanger.org/baroness-hospital/baroness-hospital (last accessed October 19, 2023).
[26] https:www.erlanger.org/locations/Erlanger-locations (last accessed October 19, 2023).
[27] https://www.erlanger.org/about-us/history (last accessed October 19, 2023).
[28] https://www.erlanger.org/about-us/about-us (last accessed October 19, 2023).
[29] https://www.erlanger.org/medical-services/services-a-z-lis (last accessed October 19, 2023).

44. Erlanger serves many of its patients via its Website and Online Platforms, which it encourages patients to use to learn about Erlanger via its main website page,[30] find doctors,[31] search for information on medical conditions,[32] find medical services,[33] access a patient portal via a pre-portal page,[34] and more. Erlanger promotes the comprehensive functionality of these tools and promotes their use, in service of its own goal of increasing profitability.

45. In furtherance of its goal of increasing sales and profitability, and to improve the success of its advertising and marketing, Defendant purposely installed the Meta Pixel and other trackers onto its Website, for the purpose of gathering information about Plaintiffs and Class Members to further its marketing efforts. But Defendant did not only generate information for its own use: it also shared patient information, including Private Information belonging to Plaintiffs and Class Members, with Facebook and other unauthorized third parties.

46. To better understand Defendant's unlawful data-sharing practices, a brief discussion of basic web design and tracking tools follows.

*i. Facebook's Business Tools and the Meta Pixel*

47. Facebook operates the world's largest social media company and generated $117 billion in revenue in 2021, roughly 97% of which was derived from selling advertising space.[35]

48. In conjunction with its advertising business, Facebook encourages and promotes entities and website owners, such as Defendant, to utilizes its "Business Tools" to gather, identify, target, and market products and services to individuals.

---

[30] https://www.erlanger.org/
[31] https://www.erlanger.org/find-a-doctor/find-a-doctor
[32] See, e.g., search for "chest pain," https://www.erlanger.org/search/search?search=chest%20pain
[33] https://www.erlanger.org/medical-services/services-a-z-list
[34] https://www.erlanger.org/medical-services/patient-portals
[35] Meta Reports Fourth Quarter and Full Year 2021 Results, FACEBOOK https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx (last visited Nov. 14, 2022).

49. Facebook's Business Tools, including the Meta Pixel and Conversions API, are bits of code that advertisers can integrate into their webpages, mobile applications, and servers, thereby enabling the interception and collection of user activity on those platforms.

50. The Business Tools are automatically configured to capture "Standard Events" such as when a user visits a particular webpage, the webpage's Universal Resource Locator ("URL"), as well as metadata, button clicks, and other information.[36] Businesses that want to target customers and advertise their services, such as Defendant, can track other user actions and can create their own tracking parameters by building a "custom event."[37]

51. One such Business Tool is the Meta Pixel, a tool that "tracks the people and type of actions they take."[38] When a user accesses a webpage that is hosting the Meta Pixel, the communications with the host webpage are instantaneously and surreptitiously duplicated and sent to Facebook—traveling from the user's browser to Facebook's server.

52. Notably, this transmission only occurs on webpages that contain the Pixel. A website owner can configure its website to use the Pixel on certain webpages that don't implicate patient privacy (such as the homepage) and disable it on pages that do implicate patient privacy (such as Defendant's "Find a Doctor" page[39]).

53. The Meta Pixel's primary purpose is for marketing and ad targeting and sales

---

[36] Specifications for Facebook Pixel Standard Events, META, https://www.facebook.com/business/help/402791146561655 (last visited Jan. 31, 2023); *see also* Facebook Pixel, Accurate Event Tracking, Advanced, META FOR DEVELOPERS; https://developers.facebook.com/docs/facebook-pixel/advanced/; *see also* Best Practices for Facebook Pixel Setup, META https://www.facebook.com/business/help/218844828315224; App Events API, META FOR DEVELOPERS, https://developers.facebook.com/docs/marketing-api/app-event-api/ (last visited Jan. 31, 2023).
[37] About Standard and Custom Website Events, META, https://www.facebook.com/business/help/964258670337005; *see also* Facebook, App Events API, *supra*.
[38] Retargeting, META, https://www.facebook.com/business/goals/retargeting.
[39] https://www.erlanger.org/find-a-doctor/find-a-doctor (last accessed October 23, 2023).

generation.[40]

54. Facebook's own website informs companies that "[t]she Meta Pixel is a piece of code that you put on your website that allows you to measure the effectiveness of your advertising by understanding the actions people take on your website."[41]

55. According to Facebook, the Meta Pixel can collect the following data.

**Http Headers** – Anything present in HTTP headers. HTTP Headers are a standard web protocol sent between any browser request and any server on the internet. HTTP Headers include IP addresses, information about the web browser, page location, document, referrer and *person using the website*. (emphasis added).

**Pixel-specific Data** – Includes Pixel ID and the Facebook Cookie.

**Button Click Data** – Includes any buttons clicked by site visitors, the labels those buttons and any pages visited as a result of the button clicks.

**Optional Values** – Developers and marketers can optionally choose to send additional information about the visit through Custom Data events. Example custom data events are conversion value, page type and more.

**Form Field Names** – Includes website field names like email, address, quantity, etc., for when you purchase a product or service. We don't capture field values unless you include them as part of Advanced Matching or optional values.[42]

56. Facebook boasts to its prospective users that the Meta Pixel can be used to:

- **Make sure your ads are shown to the right people.** Find new customers, or people who have visited a specific page or taken a desired action on your website.

- **Drive more sales.** Set up automatic bidding to reach people who are more likely to take an action you care about, like making a purchase.

- **Measure the results of your ads.** Better understand the impact of your ads

---

[40] *See* Meta Pixel, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/ (last accessed Mar. 19, 2023).
[41] About Meta Pixel, META, https://www.facebook.com/business/help/742478679120153 (last accessed Mar. 19, 2023).
[42] Meta Pixel, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/ (last accessed Mar. 19, 2023).

by measuring what happens when people see them.[43]

57. Facebook likewise benefits from the data received from the Meta Pixel and uses the data to serve targeted ads and identify users to be included in such targeted ads.

*ii. Defendant's method of transmitting Plaintiffs' and Class Members' Private Information via the Meta Pixel and/or Conversions API i.e., the Interplay between HTTP Requests and Responses, Source Code, and the Meta Pixel*

58. Web browsers are software applications that allow consumers to navigate the internet and view and exchange electronic information and communications. Each "client device" (such as computer, tablet, or smart phone) accesses web content through a web browser (e.g., Google's Chrome browser, Mozilla's Firefox browser, Apple's Safari browser, and Microsoft's Edge browser).

59. Every website is hosted by a computer "server" that holds the website's contents and through which the website owner exchanges files or communications with Internet users' client devices via their web browsers.

60. Web communications consist of HTTP Requests and HTTP Responses, and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies.[44]

61. GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular URL (i.e., web address), they also send the host server data, which is embedded inside the URL and can include cookies.

62. When an individual visits a website, their web browser sends an HTTP Request to

---

[43] About Meta Pixel, META, https://www.facebook.com/business/help/742478679120153 (last accessed Mar. 19, 2023).

[44] "Cookies are small files of information that a web server generates and sends to a web browser . . . . Cookies help inform websites about the user, enabling the websites to personalize the user experience." https://www.cloudflare.com/learning/privacy/what-are-cookies/ (last visited Jan. 27, 2023).

the entity's servers that essentially asks the website to retrieve certain information (such as Defendant's "Find a Physician" page). The entity's servers send the HTTP Response, which contains the requested information in the form of "Markup." This is the foundation for the pages, images, words, buttons, and other features that appear on the patient's screen as they navigate a website.

63. Every website is comprised of Markup and "Source Code." Source Code is simply a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

64. Source code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser's user.

65. Defendant's implementation of the Meta Pixel is source code that acted much like a traditional wiretap, intercepting and transmitting communications intended only for Defendant.

66. Separate from the Meta Pixel, Facebook and other website owners can place third-party cookies in the web browsers of users logged into their websites or services. These cookies can uniquely identify the user so the cookie owner can track the user as she moves around the internet—whether on the cookie owner's website or not. Facebook uses this type of third-party cookie when Facebook account holders use the Facebook app or website. As a result, when a Facebook account holder uses Defendant's Website, the account holder's unique Facebook ID is sent to Facebook, along with the intercepted communication, allowing Facebook to identify the patient associated with the Private Information it has intercepted.

67. With substantial work and technical know-how, internet users can sometimes circumvent this browser-based wiretap technology. To counteract this, third parties bent on

16

gathering data and Private Information implement workarounds that are difficult to detect or evade. Facebook's workaround is its Conversions API tool, which is particularly effective because the data transmitted via this tool does not rely on the website visitor's web browsers. Rather, the information travels directly from the entity's server to Facebook's server.

68. Conversions API "is designed to create a direct connection between [web hosts'] marketing data and [Facebook]."[45] Thus, the entity receives and stores its communications with patients on its server before Conversions API collects and sends those communications—and the Private Information contained therein—to Facebook.

69. Notably, client devices do not have access to host servers and thus cannot prevent (or even detect) this additional transmission of information to Facebook.

70. While there is no way to confirm with certainty that a website owner is using Conversions API without accessing the host server, Facebook instructs companies like Defendant to "[u]se the Conversions API in addition to the Meta Pixel, and share the same events using both tools," because such a "redundant event setup" allows the entity "to share website events [with Facebook] that the pixel may lose."[46] Thus, if an entity implemented the Meta Pixel in accordance with Facebook's documentation, it is also reasonable to infer that it implemented the Conversions API tool on its Website.

71. The third parties to whom a website transmits data through pixels and other tracking technology do not provide any substantive content on the host website. In other words, Facebook and others like it are not providing anything to the user relating to the user's communications. Instead, these third parties are typically procured to track user data and communications only to

---

[45] About Conversions API, META, https://www.facebook.com/business/help/2041148702652965 (last visited May 15, 2023).
[46] *See* Best Practices for Conversions API, META, https://www.facebook.com/business/help/308855623839366 (last visited May 15, 2023).

serve the marketing purposes of the website owner (i.e., to bolster profits).

72. Accordingly, without any knowledge, authorization, or action by a user, a website owner like Defendant can use its source code to commandeer its patients' computing devices, causing the device's web browser to contemporaneously and invisibly re-direct the patients' communications to hidden third parties like Facebook.

73. In this case, Defendant employed the Meta Pixel and potentially Conversions API to intercept, duplicate, and re-direct Plaintiffs' and Class Members' Private Information to Facebook contemporaneously, invisibly, and without the patient's knowledge.

74. Consequently, when Plaintiffs and Class Members visited Defendant's Website and communicated their Private Information, it was simultaneously intercepted and transmitted to Facebook.

75. On information and belief, Erlanger also employed other trackers, which likewise transmitted Plaintiffs' and the Class Members' Private Information to third parties without Plaintiffs' and Class Members' knowledge or authorization.

### iii. Defendant Violated its own Privacy Policies

76. Erlanger is covered under privacy policies, including a Joint Notice of Privacy Practices[47] ("Notice of Privacy Practices"), and a Patient Rights statement,[48] and a Website Disclaimer[49] which are posted and maintained on Defendant's Website (collectively, "Privacy Policies").

---

[47] Erlanger Health, Joint Notice of Privacy Practices, effective May 1, 2018, available at https://www.erlanger.org/media/file/policies/Notice_Priv_Pract_Broch_AB835B_5-18_HR.PDF (last accessed October 23, 2023), **attached as Exhibit B.**

[48] Erlanger Patient Rights, avail. at https://www.erlanger.org/media/file/policies/Patient%20Rights.pdf **attached as Exhibit C.**

[49] https://www.erlanger.org/patient-and-family-resources/policies/policies#webdisclaimer

77. On information and belief, Erlanger does not maintain a separate privacy policy for its Website.

78. The Notice of Privacy Practices, "describes [its] hospital's practices, along with the practices of any health care professional authorized to enter information into [patient's] hospital chart, in using and disclosing [their] protected health information. [...] It also tells [patients] how [their] medical information may be used or shared and how [they] can get [their] information."[50]

79. In the Notice of Privacy Practices, Defendant states that:

> Why We Keep Information About You
> We keep medical information about you to help care for you and because the law requires us to. The law also says we must:
> • Protect your medical information;
> • Give you this Joint Notice and describe our practices; and
> • Follow what this Joint Notice says.

[51]

80. In Defendant's Notice of Privacy Practices, Erlanger enumerates certain purposes for which it may use and share patient's medical and health information, including: for organized care arrangements; for health information exchanges; for treatment; for billing and payment purposes; for "Business Reasons (Operations)" such as to follow laws and regulations, to train and education, for credentialing, licensing, certification and accreditation, to improve care, to budget and plan, to do an audit, to maintain computer systems, to evaluate staff, to decided if they should offer more services, and to find out how satisfied its patients are; to contact patients about appointments, insurance, and other matters; for health oversight and public health reporting; for organ, eye, and tissue donation; to tell patients about treatment options or health-related products; for worker's compensation; for fundraising; for the hospital directory; to inform family members and friends involved in patient care, or paying for care; for research; for state-specific

---

[50] Erlanger Health, Joint Notice of Privacy Practices, Exhibit B.
[51] *Id.*

requirements; for lawsuits and disputes; with military authorities; with law enforcement or other officials; with coroners, federal official for national security; with correctional institutions if patients are inmates; with schools to confirm immunizations; and with business associates it has contracted with to perform agreed upon services or billing.[52]

81.    In its Notice of Privacy Practices, Defendant specifically acknowledges, represents, and promises that:

> We will not use or share your medical information for reasons other than those described in this Joint Notice unless you agree to this in writing. For example, you may want us to give medical information to your employer. Unless otherwise authorized by law, we will do this only with your written authorization. **Likewise, unless otherwise authorized by law, we would not use your information for marketing, sell your information,** or share psychotherapy notes **without your written authorization.**[53]

82.    *Nothing* in Defendant's Notice of Privacy Practices permits Erlanger to disclose Private Information to unauthorized third parties via the Meta Pixel and related tracking technologies for marketing purposes without written authorization, as occurred in the Disclosure in this action.

83.    Further, in its Notice of Privacy Practices, Erlanger promises patients that they "have a right to know if your information has been breached. We will follow what the federal and state privacy and security laws require, including notifying you in writing of any impact that breach may have had on you and/or your family member(s) and any actions we have taken to minimize that impact."[54]

---

[52] *Id.*
[53] *Id.* (emphasis added).
[54] *Id.*

84. In addition, Defendant maintains a Patient Rights statement, stating:

**You have the right to privacy, including the right to:**

- Receive care in an environment that preserves dignity and contributes to a positive self-image.
- Have the contents of your medical record protected, whether oral or in paper or electronic format, from unauthorized disclosure.
- Not have any photos or videos taken of you unless you agree to this, except as needed to treat you. [55]

85. Moreover, on its Website, Erlanger provides a Website Disclaimer, which, as relevant here, provides, "[o]ur website does not host any form of advertisement." [56]

86. Despite these express, specific representations and promises, Erlanger does indeed transfer Private Information to third parties for marketing purposes, without written authorization. Using the Meta Pixel, Defendant used and disclosed Plaintiffs' and Class Member's Private Information and confidential communications to Facebook, and likely other unauthorized third parties, without written authorization, and in violation of its Privacy Policies.

*iv. Erlanger Unauthorizedly Disclosed Plaintiffs' and the Class's Private Information*

87. Defendant disclosed Plaintiffs' and Class Members' Private Information and confidential communications to Facebook and others by collecting and transmitting user interactions with Erlanger's Website and sending records of those interactions to Facebook via the Meta Pixel and tracking technology installed on its main website page,[57] Find A Doctor page,[58] on search queries for information on medical conditions,[59] on pages to find medical services,[60] and on the pre-portal page to access a patient portal.[61]

---

[55] Erlanger Patient Rights, **Exhibit C.**
[56] https://www.erlanger.org/patient-and-family-resources/policies/policies#webdisclaimer
[57] https://www.erlanger.org/ (last accessed October 23, 2023).
[58] https://www.erlanger.org/find-a-doctor/find-a-doctor (last accessed October 23, 2023).
[59] See, e.g., search for "chest pain," https://www.erlanger.org/search/search?search=chest%20pain (last accessed October 23, 2023).
[60] https://www.erlanger.org/medical-services/services-a-z-list (last accessed October 23, 2023).
[61] https://www.erlanger.org/medical-services/patient-portals (last accessed October 23, 2023).

88. For example, Defendant has installed the Meta Pixel on its "Find a Doctor" page[62] e.g., to find a cardiology doctor:

**Meta Pixel**
Pixel ID: 1136294233161775 click to copy

Troubleshoot Pixel
Set Up Events New!

▼ ⊘ PageView

**EVENT INFO**

Setup Method: Manual
URL called: Hide

```
https://www.facebook.com/tr/?id=1136294233161775&ev=PageVi
ew&dl=https%3A%2F%2Fwww.erlanger.org&rl=https%3A%2F%2Fwww.
erlanger.org&if=false&ts=1696978283969&sw=1920&sh=1080&v=
2.9.133&r=stable&ec=0&o=28&fbp=fb.1.1696977699531.16653157
9&cs_est=true&pm=1&hrl=d21aba&ler=empty&it=1696978283881&c
oo=false&cs_cc=1&rqm=GET
```

Load Time: 123.23 ms
Pixel Code: Hide

```
<noscript><img height="1" width="1" style="display:none" s
rc="https://www.facebook.com/tr?id=1136294233161775&amp;ev
=PageView&amp;noscript=1"></noscript>
```

Pixel Location: Hide

```
https://www.erlanger.org/find-a-doctor/ContentPage.aspx?nd
=523
```

Frame: Window

89. When a patient visits Defendant's Website and searches for a doctor on Erlanger's "Find a Doctor" page, e.g., a cardiology doctor, the individual's browser sends a request to Defendant' server requesting that it load the webpage. Then, Meta Pixel sends secret instructions back to the individual's browser, causing it to imperceptibly record the patient's communication with Erlanger and transmit it to Facebook's servers alongside personally identifying information, such as the patient's IP address. Thus, any Website page a patient visits is then reported back to Facebook, alongside information identifying the patient.

90. This is likewise the case for Defendant's main Website page,[63] on searches for

---

[62] https://www.erlanger.org/find-a-doctor/find-a-doctor (last accessed October 23, 2023).
[63] https://www.erlanger.org/ (last accessed October 23, 2023).

information on medical conditions,[64] on pages to find medical services,[65] and on the pre-portal page to access a patient portal.[66]

91.     After collecting and intercepting this information, Facebook processes it, analyzes it, and assimilates it into its own massive datasets, before selling access to this data in the form of targeted advertisements. Employing "Audiences"—subsections of individuals identified as sharing common traits—Facebook promises the ability to "find the people most likely to respond to your ad."[67] Advertisers can purchase the ability to target their ads based on a variety of criteria: "Core Audiences," individuals who share a location, age, gender, and/or language;[68] "Custom Audiences," individuals who have taken a certain action, such as visiting a website, using an app, or buying a product bought a product;[69] and/or "Lookalike Audiences," groups of individuals who "resemble" a Custom Audience, and who, as Facebook promises, "are likely to be interested in your business because they're similar to your best existing customers.[70]

92.     Google and other companies process data in a similar manner and use it to build marketing and other data profiles allowing for targeted advertising.

93.     Defendant could have chosen not to use the Meta Pixel, or it could have configured it to limit the information that it communicated to third parties, but it did not. Instead, it intentionally selected and took advantage of the features and functionality of the Pixel that resulted in the Disclosure of Plaintiffs' and Class Members' Private Information.

---

[64] See, e.g., search for "chest pain," https://www.erlanger.org/search/search?search=chest%20pain (last accessed October 23, 2023).

[65] https://www.erlanger.org/medical-services/services-a-z-list (last accessed October 23, 2023).

[66] https://www.erlanger.org/medical-services/patient-portals (last accessed October 23, 2023).

[67] Audience Ad Targeting, Meta, https://www.facebook.com/business/ads/ad-targeting (last visited Aug. 14, 2023).

[68] Id.

[69] Id.

[70] How to Create a Lookalike Audience on Meta Ads Manager, Meta Business Help Center, https://www.facebook.com/business/help/465262276878947 (last visited Aug. 14, 2023).

94. Along those same lines, Defendant could have chosen not to use other tracking technologies to track Plaintiffs and Class Members private communications and transmit that information to unauthorized third parties. It did so anyway, intentionally taking advantage of these trackers despite the harm to Plaintiffs and Class Members' privacy.

95. Defendant used and disclosed Plaintiffs' and Class Members' Private Information to Facebook, and possibly other third parties for the purpose of marketing its services and increasing its profits.

96. On information and belief, Defendant shared, traded, or sold Plaintiffs' and Class Members' Private Information with Facebook, and potentially other third parties, in exchange for improved targeting and marketing services.

97. Plaintiffs and the proposed Class Members never consented, agreed, authorized, or otherwise permitted Defendant Erlanger to intercept their communications or to use or disclose their Private Information for marketing purposes. Plaintiffs were never provided with any written notice that Defendant disclosed its patients' Protected Health Information to Facebook and others, nor were they provided any means of opting out of such disclosures. Defendant nonetheless knowingly disclosed their Private Information including PHI and PII to unauthorized entities.

98. Plaintiffs and Class Members relied on Defendant to keep their Private Information confidential and securely maintained, to use this information for legitimate healthcare purposes only, and to make only authorized disclosures of this information.

99. Furthermore, Defendant actively misrepresented that it would preserve the security and privacy of Plaintiffs' and Class Members' Private Information. In actuality, Defendant shared data about Plaintiffs' and Class Members' activities on the Online Platforms alongside identifying details about the Plaintiffs and Class Members, such as their IP addresses.

24

100. By law, Plaintiffs and the Class Members are entitled to privacy in their Protected Health Information and confidential communications. Erlanger deprived Plaintiffs and Class Members of their privacy rights when it (1) implemented a system that surreptitiously tracked, recorded, and disclosed Plaintiffs' and Class Members' confidential communications, Personally Identifiable Information, and Protected Health Information; (2) disclosed patients' Private Information to unauthorized, third-party eavesdroppers, including Facebook and possibly others; and (3) undertook this pattern of conduct without notifying Plaintiffs and Class Members and without obtaining their express written consent.

**B. Plaintiffs' Experiences**

### i. *Plaintiff Jane Doe*

101. Plaintiff Jane Doe has been a patient of Defendant since 2018, receiving healthcare services from Erlanger and physicians in Erlanger's network, namely at Defendant's Erlanger East Hospital on Gun Barrell Road, physical therapy office, and other locations for orthopedics, primary care, and physical therapy. She relied on Erlanger's Online Platforms to communicate confidential patient information.

102. 101. Plaintiff Jane Doe accessed Defendant's Online Platforms at Defendant's direction and encouragement beginning in 2018, including but not limited to searching for an orthopedic doctor. She reasonably expected that her online communications with Erlanger were confidential, solely between herself and Erlanger, and that, as such, those communications would not be transmitted to or intercepted by a third party.

103. Plaintiff Jane Doe provided her Private Information to Defendant and trusted that the information would be safeguarded according to Erlanger's privacy policies and the law.

104. As described herein, by use of the Meta Pixel and tracking technology, Erlanger

sent Plaintiff Jane Doe's Private Information to Facebook and possibly others when she used Defendant's Online Platforms to communicate healthcare and identifying information to Erlanger.

105. Pursuant to the process described herein, Erlanger assisted Facebook and possibly others in intercepting Plaintiff Jane Doe's confidential communications, including those that contained PII and PHI. Erlanger facilitated these interceptions without Plaintiff Jane Doe's knowledge, consent, or express written authorization.

106. By failing to receive the requisite consent, Erlanger breached confidentiality and unlawfully disclosed Plaintiff Jane Doe's Private Information.

107. As a result of Erlanger's Disclosure of Plaintiff Jane Doe's Private Information via the Meta Pixel and other technologies to third parties without authorization, she now receives voluminous targeted health-related advertisements from Facebook, reflecting her private medical treatment information, and causing her emotional distress.

### ii. Plaintiff John Doe

108. Plaintiff John Doe has been a patient of Defendant since 1990 or 1991, receiving healthcare services from Erlanger and physicians in Erlanger's network, for weight loss surgery, hip replacement surgery, for HIV/AIDS, and previously for diabetes He relied on Erlanger's Online Platforms to communicate confidential patient information.

109. Plaintiff John Doe accessed Defendant's Online Platforms at Defendant's direction and encouragement, including but not limited to finding doctors, searching for medical treatment information, and researching services. He reasonably expected that his online communications with Erlanger were confidential, solely between himself and Erlanger, and that, as such, those communications would not be transmitted to or intercepted by a third party.

26

110. Plaintiff John Doe provided his Private Information to Defendant and trusted that the information would be safeguarded according to Erlanger's privacy policies and the law.

111. As described herein, by use of the Meta Pixel and tracking technology, Erlanger sent Plaintiff John Doe's Private Information to Facebook and possibly others when he used Defendant's Online Platforms to communicate healthcare and identifying information to Erlanger.

112. Pursuant to the process described herein, Erlanger assisted Facebook and possibly others in intercepting Plaintiff John Doe's confidential communications, including those that contained PII and PHI. Erlanger facilitated these interceptions without Plaintiff John Doe's knowledge, consent, or express written authorization.

113. By failing to receive the requisite consent, Erlanger breached confidentiality and unlawfully disclosed Plaintiff John Doe's Private Information.

114. As a result of Erlanger's Disclosure of Plaintiff John Doe's Private Information via the Meta Pixel and other technologies to third parties without authorization, he now receives targeted advertisements from Facebook for studies for bariatric vitamins, diabetes medications, and for classes at Erlanger, reflecting his private medical treatment information, and causing him emotional distress.

### iii. Plaintiff Jack Doe

115. Plaintiff Jack Doe has been a patient of Defendant since 2006, approximately, receiving healthcare services from Erlanger and physicians in Erlanger's network, including at Baroness Hospital, for a gastrointestinal doctor, for weight loss, and in treatment of an overdose; as well as working for Erlanger. He relied on Erlanger's Online Platforms to communicate confidential patient information.

116. Plaintiff Jack Doe accessed Defendant's Online Platforms at Defendant's

direction and encouragement beginning in 2004, including but not limited to finding a weight loss doctor, searching for treatment information, and accessing the patient portal to schedule appointments. He reasonably expected that his online communications with Erlanger were confidential, solely between himself and Erlanger, and that, as such, those communications would not be transmitted to or intercepted by a third party.

117. Plaintiff Jack Doe provided his Private Information to Defendant and trusted that the information would be safeguarded according to Erlanger's privacy policies and the law.

118. As described herein, by use of the Meta Pixel and tracking technology, Erlanger sent Plaintiff Jack Doe's Private Information to Facebook and possibly others when he used Defendant's Online Platforms to communicate healthcare and identifying information to Erlanger.

119. Pursuant to the process described herein, Erlanger assisted Facebook and possibly others in intercepting Plaintiff Jack Doe's confidential communications, including those that contained PII and PHI. Erlanger facilitated these interceptions without Plaintiff Jack Doe's knowledge, consent, or express written authorization.

120. By failing to receive the requisite consent, Erlanger breached confidentiality and unlawfully disclosed Plaintiff Jack Doe's Private Information.

121. As a result of Erlanger's Disclosure of Plaintiff Jack Doe's Private Information via the Meta Pixel and other technologies to third parties without authorization, Plaintiffs now receives targeted advertisements from Facebook for Ozempic, a weight loss medication, reflecting his private medical treatment information, and causing him emotional distress.

### iv. Plaintiff Janet Doe

122. Plaintiff Janet Doe has been a patient of Defendant since 2018, receiving healthcare services from Erlanger and physicians in Erlanger's network, at a primary care

doctor's office at an Erlanger clinic, including for primary care treatment and gynecological care. She relied on Erlanger's Online Platforms to communicate confidential patient information.

123. Plaintiff Janet Doe accessed Defendant's Online Platforms at Defendant's direction and encouragement beginning in 2018, including but not limited to finding a doctor, a gynecologist, to search for medical conditions and symptoms related to fibromyalgia and multiple sclerosis, to research medical services, and to access the patient portal to schedule appointments. She reasonably expected that her online communications with Erlanger were confidential, solely between herself and Erlanger, and that, as such, those communications would not be transmitted to or intercepted by a third party.

124. Plaintiff Janet Doe provided her Private Information to Defendant and trusted that the information would be safeguarded according to Erlanger's privacy policies and the law.

125. As described herein, by use of the Meta Pixel and tracking technology, Erlanger sent Plaintiff Janet Doe's Private Information to Facebook and possibly others when she used Defendant's Online Platforms to communicate healthcare and identifying information to Erlanger.

126. Pursuant to the process described herein, Erlanger assisted Facebook and possibly others in intercepting Plaintiff Janet Doe's confidential communications, including those that contained PII and PHI. Erlanger facilitated these interceptions without Plaintiff Janet Doe's knowledge, consent, or express written authorization.

127. By failing to receive the requisite consent, Erlanger breached confidentiality and unlawfully disclosed Plaintiff Janet Doe's Private Information.

128. As a result of Erlanger's Disclosure of Plaintiff Janet Doe's Private Information via the Meta Pixel and other technologies to third parties without authorization, Plaintiff Janet Doe now receives targeted advertisements from Facebook related to fibromyalgia and multiple

scoliosis, reflecting her private medical treatment information, and causing her emotional distress.

**C. Investigations and Reports Reveal the Meta Pixel's Impermissible Collection of PHI**

129. In June 2020, after promising users that app developers would not have access to data if users were not active in the prior 90 days, Facebook revealed that it still enabled third-party developers to access this data.[71] This failure to protect users' data enabled thousands of developers to see data on inactive users' accounts if those users were Facebook friends with someone who was an active user.

130. On February 18, 2021, the New York State Department of Financial Services released a report detailing the significant privacy concerns associated with Facebook's data collection practices, including the collection of health data. The report noted that while Facebook maintained a policy that instructed developers not to transmit sensitive medical information, Facebook received, stored, and analyzed this information anyway. The report concluded that "[t]she information provided by Facebook has made it clear that Facebook's internal controls on this issue have been very limited and were not effective . . . at preventing the receipt of sensitive data."[72]

131. The New York State Department of Financial Service's concern about Facebook's cavalier treatment of private medical data was not misplaced. In June 2022, the FTC finalized a different settlement involving Facebook's monetizing of sensitive medical data. In that case, the more than 100 million users of Flo, a period and ovulation tracking app, learned something

---

[71] Kurt Wagner & Bloomberg, Facebook Admits Another Blunder with User Data, FORTUNE (July 1, 2020 at 6:30 p.m.) https://fortune.com/2020/07/01/facebook-user-data-apps-blunder/.

[72] New York State Department of Financial Services, REPORT ON INVESTIGATION OF FACEBOOK INC. DATA PRIVACY CONCERNS, (Feb. 18, 2021) https://www.dfs.ny.gov/system/files/documents/2021/02/facebook_report_20210218.pdf.

startling: the company was sharing their data with Facebook.[73] When a user was having their period or informed the app of their intention to get pregnant, Flo would tell Facebook, which could then use the data for all kinds of activities including targeted advertising. In 2021, Flo settled with the Federal Trade Commission for lying to its users about secretly sharing their data with Facebook, as well as with a host of other internet advertisers, including Google, Fabric, AppsFlyer, and Flurry. The FTC reported that Flo "took no action to limit what these companies could do with users' information."[74]

132. More recently, Facebook employees admitted to lax protections for sensitive user data. Facebook engineers on the ad business product team conceded in a 2021 privacy review that "[w]e do not have an adequate level of control and explainability over how our systems use data, and thus we can't confidently make controlled policy changes or external commitments such as 'we will not use X data for Y purpose.'"[75]

133. Furthermore, in June 2022, an investigation by The Markup[76] revealed that the Meta Pixel was embedded on the websites of 33 of the top 100 hospitals in the nation.[77] On those hospital websites, the Meta Pixel collects and sends Facebook a "packet of data," including sensitive personal health information, whenever a user interacts with the website, for example, by clicking a button to schedule a doctor's appointment.[78] The data is connected to an IP address, which is "an

---

[73] Justin Sherman, Your Health Data Might Be for Sale, SLATE (June 22, 2022 at 5:50 a.m.) https://slate.com/technology/2022/06/health-data-brokers-privacy.html.

[74] Id.

[75] Lorenzo Franceschi-Bicchierai, Facebook Doesn't Know What It Does with Your Data, or Where It Goes: Leaked Document, VICE (April 26, 2022) https://www.vice.com/en/article/akvmke/facebook-doesnt-know-what-it-does-with-your-data-or-where-it-goes.

[76] The Markup is a nonprofit newsroom that investigates how powerful institutions are using technology to change our society. See www.themarkup.org/about (last accessed Mar. 19, 2023).

[77] Todd Feathers, Simon Fondrie-Teitler, Angie Waller, & Surya Mattu, Facebook Is Receiving Sensitive Medical Information from Hospital Websites, THE MARKUP (June 16, 2022 6:00 a.m.) https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites.

[78] Id.

identifier that's like a computer's mailing address and can generally be linked to a specific individual or household—creating an intimate receipt of the appointment request for Facebook."[79]

134. During its investigation, The Markup found that Facebook's purported "filtering" failed to discard even the most obvious forms of sexual health information. Worse, the article found that the data that the Meta Pixel was sending Facebook from hospital websites not only included details such as patients' medications, descriptions of their allergic reactions, details about their upcoming doctor's appointments, but also included patients' names, addresses, email addresses, and phone numbers.[80]

135. In addition to the 33 hospitals identified by The Markup that had installed the Meta Pixel on their websites, The Markup identified seven health systems that had installed the Meta Pixel inside their password-protected patient portals.[81]

136. David Holtzman, health privacy consultant and former senior privacy adviser in the U.S. Department of Health and Human Services' Office for Civil Rights, stated she was "deeply troubled" by what the hospitals capturing and sharing patient data in this way.[82]

**D. Defendant Violated HIPAA Standards**

137. Under HIPAA, a healthcare provider may not disclose personally identifiable, non-public medical information (PHI) about a patient, a potential patient, or household member of a patient for marketing purposes without the patients' express written authorization.[83]

138. Guidance from the United States Department of Health and Human Services instructs healthcare providers that patient status alone is protected by HIPAA.

---

[79] Id.
[80] Id.
[81] Id.
[82] Id.
[83] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

139. In Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule, the Department instructs:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data... If such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI.[84]

140. In its guidance for Marketing, the Department further instructs:

> The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of their or their protected health information can be made for marketing. ... Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list. (Emphasis added).[85]

141. In addition, the Office for Civil Rights (OCR) at the U.S. Department of Health and Human Services (HHS) has issued a Bulletin to highlight the obligations of HIPAA-covered entities and business associates ("regulated entities") under the HIPAA Privacy, Security, and Breach Notification Rules ("HIPAA Rules") when using online tracking technology.[86]

142. According to the Bulletin, "HIPAA Rules apply when the information that

---

[84] U.S. Department of Health and Human Services, Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule, (Nov. 26, 2012) https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf.

[85] U.S. Department of Health and Human Services, Marketing, (Dec. 3, 2002) https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf.

[86] *See* U.S. Department of Health and Human Services, Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates, https://www.hhs.gov/hipaa/forprofessionals/privacy/guidance/hipaa-online-tracking/index.html.

regulated entities collect through tracking technologies or disclose to tracking technology vendors includes protected health information."[87]

143. Citing The Markup's June 2022 article, the Bulletin expressly notes:

Some regulated entities may share sensitive information with online tracking technology vendors and such sharing may be unauthorized disclosures of PHI with such vendors. **Regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules.** For example, disclosures of PHI to tracking technology vendors or marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.

An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI **only** as expressly permitted or required by the HIPAA Privacy Rule. [88]

144. In other words, HHS has expressly stated that Defendant's conduct of implementing the Meta Pixel is a violation of HIPAA Rules.

**E.      Defendant Violated FTC Standards, and the FTC and HHS Take Action**

145. The Federal Trade Commission ("FTC") has also recognized that implementation of the Meta Pixel and other tracking technologies pose "serious privacy and security risks" and "impermissibly disclos[e] consumers' sensitive personal health information to third parties."[89]

---

[87] *Id.*
[88] *Id.* (emphasis in original) (internal citations omitted).
[89] Re: Use of Online Tracking Technologies, U.S. Dep't of Health & Human Services, (July 20, 2023) (available at https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf), **Exhibit A.**

146. On July 20, 2023, the FTC and HHS sent a "joint letter to approximately 130 hospital systems and telehealth providers to alert them about the risks and concerns about the use of technologies, such as Meta/Facebook pixel and Google Analytics, that can track a user's online activities."[90]

147. Therein, the FTC reminded healthcare providers that "HIPAA regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to third parties or any other violations of the HIPAA Rules"[91] and that "[t]their is true even if you relied upon a third party to develop your website or mobile app and even if you do not use the information obtained through use of a tracking technology for any marketing purposes."[92]

148. Entities that are not covered by HIPAA also face accountability for disclosing consumers' sensitive health information under the Health Breach Notification Rule. 16 C.F.R. § 318. This Rule requires that companies dealing with health records notify the FTC and consumers if there has been a breach of unsecured identifiable health information, or else face civil penalties for violations. *Id.* According to the FTC, "a 'breach' is not limited to cybersecurity intrusions or nefarious behavior. Incidents of unauthorized access, *including sharing of covered information without an individual's authorization*, triggers notification obligations under the Rule."[93]

149. Additionally, the FTC Act makes it unlawful to employ "[u]nfair methods of

---

[90] FTC and HHS Warn Hospital Systems and Telehealth Providers about Privacy and Security Risks from Online Tracking Technologies, FEDERAL TRADE COMMISSION (July 20, 2023) https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking?utm_source=govdelivery.

[91] *Id.*

[92] *Id.*

[93] Statement of the Commission: On Breaches by Health Apps and Other Connected Devices, U.S. Fed. Trade Commission, (Sept. 15, 2021) (available at https://www.ftc.gov/system/files/documents/public_statements/1596364/statement_of_the_commission_on_breaches_by_health_apps_and_other_connected_devices.pdf) (emphasis added).

competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce[.]" 15 U.S.C. § 45(a). According to the FTC, "the disclosure of [sensitive health] information without a consumer's authorization can, in some circumstances, violate the FTC Act as well as constitute a breach of security under the FTC's Health Breach Notification Rule."[94]

150. As such, the FTC and HHS have expressly stated that conduct like Defendant's runs afoul of the FTC Act and/or the FTC's Health Breach Notification Rule.

**F. Defendant Violated Industry Standards**

151. A medical provider's duty of confidentiality is a cardinal rule and is embedded in the physician-patient and hospital-patient relationship.

152. The American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications, which are applicable to Erlanger and its physicians.

153. AMA Code of Ethics Opinion 3.1.1 provides:

Protecting information gathered in association with the care of the patient is a core value in health care . . . . Patient privacy encompasses a number of aspects, including . . . personal data (informational privacy).

154. AMA Code of Medical Ethics Opinion 3.2.4 provides:

Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial

---

[94] *See, e.g.,* U.S. v. Easy Healthcare Corp., Case No. 1:23-cv-3107 (N.D. Ill. 2023), https://www.ftc.gov/legallibrary/browse/cases-proceedings/202-3186-easy-healthcare-corporation-us-v; In the Matter of BetterHelp, Inc., FTC Dkt. No. C-4796 (July 14, 2023), https://www.ftc.gov/legal-library/browse/cases-proceedings/2023169-betterhelp-inc-matter; U.S. v. GoodRx Holdings, Inc., Case No. 23-cv-460 (N.D. Cal. 2023), https://www.ftc.gov/legal-library/browse/cases-proceedings/2023090-goodrx-holdings-inc; In the Matter of Flo Health Inc., FTC Dkt. No. C-4747 (June 22, 2021), https://www.ftc.gov/legal-library/browse/casesproceedings/192-3133-flo-health-inc.

purposes should: (a) Only provide data that has been de-identified. [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about the purposes for which access would be granted.

155. AMA Code of Medical Ethics Opinion 3.3.2 provides:

Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically . . . must . . . release patient information only in keeping ethics guidelines for confidentiality.

## G. Plaintiffs' and Class Members' Expectation of Privacy

156. At all times when Plaintiffs and Class Members provided their Private Information to Defendant, they all had a reasonable expectation that the information would remain private and that Defendant would not share the Private Information with third parties for a commercial marketing and sales purposes, unrelated to patient care.

## H. IP Addresses are Personally Identifiable Information

157. Defendant also disclosed and otherwise assisted Facebook and potentially others with intercepting Plaintiffs' and Class Members' IP addresses using the Meta Pixel and other tracking technologies.

158. An IP address is a number that identifies the address of a device connected to the Internet.

159. IP addresses are used to identify and route communications on the Internet.

160. IP addresses of individual Internet users are used by Internet service providers, Websites, and third-party tracking companies to facilitate and track Internet communications.

161. Facebook tracks every IP address ever associated with a Facebook user.

162. Facebook tracks IP addresses for use of targeting individual homes and their occupants with advertising.

37

163. Under HIPAA, an IP address is Personally Identifiable Information:

- HIPAA defines personally identifiable information to include "any unique identifying number, characteristic or code" and specifically lists the example of IP addresses. *See* 45 C.F.R. § 164.514 (2).

- HIPAA further declares information as personally identifiable where the covered entity has "actual knowledge that the information to identify an individual who is a subject of the information." 45 C.F.R. § 164.514(2)(ii); *See also*, 45 C.F.R. § 164.514(b)(2)(i)(O).

164. Consequently, by disclosing IP addresses, Defendant's business practices violated HIPAA and industry privacy standards.

### I. Defendant Was Enriched and Benefitted from the Use of The Pixel and Unauthorized Disclosures

165. The sole purpose for Defendant's use of the Meta Pixel and other tracking technology was marketing and profits.

166. In exchange for disclosing the Private Information of its patients, Defendant is compensated by Facebook and likely others in the form of enhanced advertising services and more cost-efficient marketing on its platform.

167. Retargeting is a form of online marketing that targets users with ads based on their previous internet communications and interactions. Upon information and belief, as part of its marketing campaign, Defendant re-targeted patients and potential patients.

168. By utilizing the Meta Pixel and other trackers, the cost of advertising and retargeting was reduced, thereby benefiting Defendant.

### J. Plaintiffs' and Class Members' Private Information Had Financial Value

169. The data concerning Plaintiffs and Class Members, collected and shared by Defendant, has tremendous economic value. Data collected via the Meta Pixel, CAPI, and other online tracking tools allows Facebook to build its own massive, proprietary dataset, to which it

then sells access in the form of targeted advertisements. Targeting works by allowing advertisers to direct their ads at particular "Audiences," subsets of individuals who, according to Facebook, are the "people most likely to respond to your ad."[95] Facebook's "Core Audiences" allow advertisers to target individuals based on demographics, such as age, location, gender, or language, whereas "Custom Audiences" allow advertisers to target individuals who have "already shown interest in your business," by visiting a business's website, using an app, or engaging in certain online content.[96] Facebook's "Lookalike Audiences" go further, targeting individuals who resemble current customer profiles and whom, according to Facebook, "are likely to be interested in your business."[97]

170. Data harvesting is big business, and it drives Facebook's profit center, its advertising sales. In 2019, Facebook generated nearly $70 billion dollars in advertising revenue alone, constituting more than 98% of its total revenue for that year.[98]

171. This business model is not limited to Facebook. Data harvesting one of the fastest growing industries in the country, and consumer data is so valuable that it has been described as the "new oil." Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is only due to keep increasing; estimates for 2022 were as high as $434 per user, for a total of more than $200 billion industry wide.

172. In particular, the value of health data is well-known due to the media's extensive reporting on the subject. For example, Time Magazine published an article in 2017 titled "How

---

[95] Audience Ad Targeting, Meta, https://www.facebook.com/business/ads/ad-targeting (last visited Aug. 14, 2023).
[96] *Id.*
[97] *See* How to Create a Lookalike Audience on Meta Ads Manager, Meta Business Center, https://www.facebook.com/business/help/465262276878947 (last visited Aug. 14, 2023).
[98] *See* Here's How Big Facebook's Ad Business Really Is, CNN, https://www.cnn.com/2020/06/30/tech/facebook-ad-business-boycott/index.html (last visited Aug. 14, 2023).

Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry." Therein, Time Magazine described the extensive market for health data and observed that the health data market is both lucrative and a significant risk to privacy.[99]

173. Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[100]

## TOLLING, CONCEALMENT, AND ESTOPPEL

174. The applicable statutes of limitation have been tolled as a result of Erlanger's knowing and active concealment and denial of the facts alleged herein.

175. Erlanger seamlessly incorporated Meta Pixel and other trackers into its Website and Online Platforms while providing users with no indication that their Website usage was being tracked and transmitted to third parties. Erlanger knew that its Website incorporated Meta Pixel and other trackers, yet it failed to disclose to Plaintiffs and Class Members that their sensitive medical information would be intercepted, collected, used by, and disclosed to Facebook, and likely other third parties.

176. Plaintiffs and Class Members could not with due diligence have discovered the full scope of Erlanger's conduct, because there were no disclosures or other indication that they were interacting with websites employing Meta Pixel or any other tracking technology.

177. All applicable statutes of limitation have also been tolled by operation of the discovery rule and the doctrine of continuing tort. Erlanger's illegal interception and disclosure of

---

[99] *See* Adam Tanner, How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry, TIME, (Jan. 9, 2017 at 9:00 a.m.) https://time.com/4588104/medical-data-industry/.
[100] *See* Christina Farr, Hospital Execs Say They are Getting Flooded with Requests for Your Health Data, CNBC, (Dec. 18, 2019 at 8:27 a.m.) https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html.

Plaintiffs' Private Information has continued unabated through the present. What is more, Erlanger was under a duty to disclose the nature and significance of their data collection practices but did not do so. Erlanger is therefore estopped from relying on any statute of limitations defenses.

## CLASS ALLEGATIONS

178. Plaintiffs bring this statewide class action on behalf of themselves, and on behalf of other similarly situated persons.

179. The statewide Class that Plaintiffs seek to represent is defined as follows:

**All Tennessee citizens whose Private Information was disclosed by Defendant to third parties through the Meta Pixel and related technology without authorization.**

180. Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers, and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state, or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels, and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

181. Plaintiffs reserve the right to modify or amend the definition of the proposed class before the Court determines whether certification is appropriate.

182. This action satisfies the numerosity, commonality, typicality, and adequacy requirements under Tennessee Rule 23.01.

183. Numerosity: Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, there are hundreds or thousands of individuals whose Private Information may have been improperly used or disclosed by Defendant, and the Class is

identifiable within Defendant's records.

184. Ascertainability. Class Members are readily identifiable from information in Defendant's possession, custody, and control.

185. Commonality: Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include:

a. whether and to what extent Defendant had a duty to protect Plaintiffs' and Class Members' Private Information;

b. whether Defendant had duties not to disclose the Plaintiffs' and Class Members' Private Information to unauthorized third parties;

c. whether Defendant had duties not to use Plaintiffs' and Class Members' Private Information for non-healthcare purposes;

d. whether Defendant had duties not to use Plaintiffs' and Class Members' Private Information for unauthorized purposes;

e. whether Defendant failed to adequately Plaintiffs' Plaintiff's and Class Members' Private Information;

f. whether Defendant adequately, promptly, and accurately informed Plaintiffs and Class Members that their Private Information had been compromised;

g. whether Defendant violated the law by failing to promptly notify Plaintiffs and Class Members that their Private Information had been compromised;

h. whether Defendant failed to properly implement and configure the tracking software on its Online Platforms to prevent the disclosure of confidential communications and Private Information;

i. whether Defendant's conduct amounts to negligence *per se*;

42

j.   whether Defendant committed invasion of privacy;

k.   whether Defendant breached its contract with Plaintiffs and the Class Members; or in the alternate, whether Defendant was unjustly enriched; and,

l.   whether Defendant breached fiduciary duties to Plaintiff and the Class Members.

m.   whether Defendant engaged in unfair, unlawful, or deceptive practices by misrepresenting that it would safeguard Plaintiffs' and Class Members' Private Information.

186.   Typicality: Plaintiffs' claims are typical of those of other Class Members because all had their Private Information compromised as a result of Defendant's use and incorporation of Meta Pixel and other tracking technology.

187.   Policies Generally Applicable to the Class: This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly, and Plaintiffs' challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

188.   Adequacy: Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that Plaintiffs have no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiffs seek no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages Plaintiffs has suffered is typical of other Class Members. Plaintiffs have also retained counsel experienced in complex class action litigation, and Plaintiffs intends to prosecute this action vigorously.

43

189. Superiority and Manageability: Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

190. The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged. If the class action device were not used, Defendant would necessarily gain an unconscionable advantage because they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources. Moreover, the costs of individual suits could unreasonably consume the amounts that would be recovered, whereas proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged. Finally, individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

191. The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class

44

Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

192. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

193. Unless a Class-wide injunction is issued, Defendant may continue in its unlawful use and disclosure and failure to properly secure the Private Information of Class Members, Defendant may continue to refuse to provide proper notification to and obtain proper consent from Class Member, and Defendant may continue to act unlawfully as set forth in this Complaint.

194. Further, Defendant has acted or refused to act on grounds generally applicable to the Class, and, accordingly, final injunctive or corresponding declaratory relief regarding the whole of the Class is appropriate.

195. Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to the following:

    a. whether Defendant owed a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

    b. whether Defendant breached a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

    c. whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to the disclosure of patient information;

    d. whether an implied contract existed between Defendant on the one hand, and

Plaintiffs and Class Members on the other, and the terms of that implied contract;

e. whether Defendant breached the implied contract;

f. in the alternate, whether Defendant was unjustly enriched;

g. whether Defendant adequately and accurately informed Plaintiffs and Class Members that their Private Information had been used and disclosed to third parties;

h. whether Defendant failed to implement and maintain reasonable security procedures and practices;

i. whether Defendant committed an invasion of privacy;

j. whether Defendant had fiduciary duties to Plaintiffs and the Class Members;

k. whether Defendant breached its fiduciary duties; and,

l. whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard Plaintiffs' and Class Members' Private Information; and

m. whether Plaintiffs and the Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

<div align="center">

**COUNT I**
**NEGLIGENCE**
**(On Behalf of Plaintiffs and the Class)**

</div>

196. Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

197. Defendant owed to Plaintiffs and Class Members a duty to exercise reasonable care in handling and using Plaintiffs' and Class Members' Private Information in its care and custody, including implementing industry-standard privacy procedures sufficient to reasonably protect the information from the disclosure and unauthorized transmittal and use of Private Information that occurred.

198. Defendant acted with wanton and reckless disregard for the privacy and confidentiality of Plaintiffs' and Class Members' Private Information by disclosing and providing access to this information to third parties for the financial benefit of the third parties and Defendant.

199. Defendant owed these duties to Plaintiffs and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's disclosure of their Private Information to benefit third parties and Defendant. Defendant actively sought and obtained Plaintiffs' and Class Members' Private Information.

200. Private Information is highly valuable, and Defendant knew, or should have known, the harm that would be inflicted on Plaintiffs and Class Members by disclosing their Private Information to third parties. This disclosure was of benefit to third parties and Defendant by way of data harvesting, advertising, and increased sales.

201. Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the personal information and Private Information of Plaintiffs and Class Members. This failure actually and proximately caused Plaintiffs' and Class Members' injuries.

202. As a direct and traceable result of Defendant's negligence and/or negligent supervision, Plaintiffs and Class Members have suffered or will suffer damages, including monetary damages, inappropriate advertisements and use of their Private Information for advertising purposes, and increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

203. Defendant's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiffs' and Class Members' actual,

tangible, injury-in-fact and damages, including, without limitation, the unauthorized access of their Private Information by third parties, improper disclosure of their Private Information, lost benefit of their bargain, lost value of their Private Information, and lost time and money incurred to mitigate and remediate the effects of use of their information that resulted from and were caused by Defendant's negligence. These injuries are ongoing, imminent, immediate, and continuing.

204. In failing to secure Plaintiffs' and Class Members' Private Information, PII and PHI, Defendant is guilty of oppression, fraud, or malice. Defendant acted or failed to act with a reckless, willful, or conscious disregard of Plaintiffs' and Class Members' rights. Plaintiffs, in addition to seeking actual damages, also seek punitive damages on behalf of herself and the Class.

<div align="center">

**COUNT II**
**NEGLIGENCE *PER SE***
**(On Behalf of Plaintiffs and the Class)**

</div>

205. Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

206. Plaintiffs allege this negligence *per se* theory as alternative to their other negligence claim.

207. Pursuant to the laws set forth herein, including the FTC Act, HIPAA, the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C and the other sections identified above, Defendant was required by law to maintain adequate and reasonable data and cybersecurity measures to maintain the security and privacy of Plaintiffs' and Class Members' Private Information.

208. Plaintiffs and Class Members are within the class of persons that these statutes and rules were designed to protect.

<div align="center">48</div>

209. Defendant had a duty to have procedures in place to detect and prevent the loss or unauthorized dissemination of Plaintiffs' and Class Members' PII and PHI.

210. Defendant owed a duty to timely and adequately inform Plaintiffs and Class Members, in the event of their PII and PHI being improperly disclosed to unauthorized third parties.

211. It was not only reasonably foreseeable, but it was intended, that the failure to reasonably protect and secure Plaintiffs' and Class Members' PII and PHI in compliance with applicable laws would result in an unauthorized third-party such as Facebook gaining access to Plaintiffs' and Class Members' PII and PHI, resulting in Defendant's liability under principles of negligence *per se*.

212. Defendant violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect Plaintiffs' and Class Members' PII and PHI and not complying with applicable industry standards as described in detail herein.

213. Plaintiffs' and Class Member's PII and PHI constitute personal property that was taken and misused as a proximate result of Defendant's negligence, resulting in harm, injury and damages to Plaintiffs and Class Members.

214. As a proximate result of Defendant's negligence and breach of duties as set forth above, Defendant's breaches of duty caused Plaintiffs and Class Members to, *inter alia*, have their data shared with third parties without their authorization or consent, receive unwanted advertisements that reveal seeking treatment for specific medical conditions, fear, anxiety and worry about the status of their PII and PHI, diminution in the value of their personal data for which there is a tangible value, and/or a loss of control over their PII and PHI, all of which can constitute actionable actual damages.

49

215. In failing to secure Plaintiffs' and Class Members' PII and PHI, Defendant is guilty of oppression, fraud, or malice. Defendant acted or failed to act with a reckless, willful, or conscious disregard of Plaintiffs' and Class Members' rights.

216. Defendant's conduct in violation of applicable laws directly and proximately caused the unauthorized access and disclosure of Plaintiffs' and Class Members' PII and PHI, and as a result, Plaintiffs and Class Members have suffered and will continue to suffer damages as a result of Defendant's conduct. Plaintiffs and Class Members seek actual, compensatory, and punitive damages, and all other relief they may be entitled to as a proximate result of Defendant's negligence *per se*.

## COUNT III
## INVASION OF PRIVACY
**(On Behalf of Plaintiffs and the Class)**

217. Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

218. Plaintiffs and Class Members had a reasonable expectation of privacy in their communications with Defendant via its Website and Online Platforms and the communications platforms and services therein.

219. Plaintiffs and Class Members communicated sensitive PHI and PII—Private Information—that they intended for only Defendant to receive and that they understood Defendant would keep private.

220. Defendant's disclosure of the substance and nature of those communications to third parties without the knowledge and consent of Plaintiffs and Class Members is an intentional intrusion on Plaintiffs' and Class Members' solitude or seclusion and their private affairs and concerns.

221. Plaintiffs and Class Members had a reasonable expectation of privacy given

Defendant's representations and Privacy Policies. Moreover, Plaintiffs and Class Members have a general expectation that their communications regarding healthcare with their healthcare providers will be kept confidential. Defendant's disclosure of PHI coupled with PII is highly offensive to the reasonable person.

222. As a result of Defendant's actions, Plaintiffs and Class Members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

223. Plaintiffs and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

224. Plaintiffs and Class Members seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate Plaintiffs and Class Members for the harm to their privacy interests as a result of its intrusions upon Plaintiffs' and Class Members' privacy.

225. Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, directed at injuring Plaintiffs and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

226. Plaintiffs also seek such other relief as the Court may deem just and proper.

<div align="center">

**COUNT IV**
**BREACH OF IMPLIED CONTRACT**
**(On behalf of Plaintiffs and the Class)**

</div>

227. Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

228. As a condition of receiving medical care from Defendant, Plaintiffs and the Class provided their Private Information and paid compensation for the treatment received. In so doing, Plaintiffs and Class Members entered into contracts with Defendant by which Defendant agreed

to safeguard and protect such information, in its Privacy Policies and elsewhere, to keep such information secure and confidential, and to "notify[] [them] in writing of any impact that breach may have had on [them] and/or [their] family member(s) and any actions we have taken to minimize that impact."[101]

229. Implicit in the agreement between Erlanger and its patients, Plaintiffs and the proposed Class Members, was the obligation that both parties would maintain the Private Information confidentially and securely.

230. Erlanger had an implied duty of good faith to ensure that the Private Information of Plaintiffs and Class Members in its possession was only used only as authorized, such as to provide medical treatment, billing, and other medical benefits from Erlanger.

231. Erlanger had an implied duty to protect the Private Information of Plaintiffs and Class Members from unauthorized disclosure or uses, and to notify them of any breach of that information.

232. Additionally, Erlanger implicitly promised to retain this Private Information only under conditions that kept such information secure and confidential.

233. Plaintiffs and Class Members fully performed their obligations under the implied contract with Erlanger. Erlanger did not. Plaintiffs and Class Members would not have provided their confidential Private Information to Erlanger in the absence of their implied contracts with Erlanger and would have instead retained the opportunity to control their Private Information for uses other than receiving medical treatment from Erlanger.

234. Erlanger breached the implied contracts with Plaintiffs and Class members by disclosing Plaintiffs' and Class Members' Private Information to an unauthorized third part, and

---

[101] *Id.*

failing to notify them of the breach of that Private Information.

235. Erlanger's acts and omissions have materially affected the intended purpose of the implied contracts requiring Plaintiffs and Class Members to provide their Private Information in exchange for medical treatment and benefits.

236. As a direct and proximate result of Defendant's above-described breach of contract, Plaintiffs and the Class have suffered (and will continue to suffer) the compromise and disclosure of their Private Information and identities.

237. As a direct and proximate result of Defendant's above-described breach of contract, Plaintiffs and the Class are entitled to recover actual, consequential, and nominal damages.

<div align="center">

**COUNT V**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and the Class)**

</div>

238. Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

239. This claim is pleaded solely in the alternative to Plaintiffs' breach of implied contract claim.

240. Plaintiffs and Class Members conferred a monetary benefit upon Erlanger in the form of valuable sensitive medical information that Defendant collected from Plaintiffs and Class Members under the guise of keeping this information private. Defendant collected, used, and disclosed this information for its own gain, including for advertisement purposes, sale, or trade for valuable services from third parties. Additionally, Plaintiffs and the Class Members conferred a benefit on Defendant in the form of monetary compensation.

241. Plaintiffs and Class Members would not have used Erlanger's services or would have paid less for those services, if they had known that Defendant would collect, use, and disclose

their Private Information to third parties.

242. Erlanger appreciated or had knowledge of the benefits conferred upon it by Plaintiffs and Class Members.

243. As a result of Erlanger's conduct, Plaintiffs and Class Members suffered actual damages in an amount equal to the difference in value between their purchases made with reasonable data privacy and security practices and procedures that Plaintiffs and Class Members paid for, and those purchases without unreasonable data privacy and security practices and procedures that they received.

244. The benefits that Defendant derived from Plaintiffs and Class Members rightly belong to Plaintiffs and Class Members themselves. It would be inequitable under unjust enrichment principles for Defendant to be permitted to retain any of the profit or other benefits it derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

245. Erlanger should be compelled to disgorge into a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds it received as a result of its conduct and the unauthorized Disclosure alleged herein.

<div align="center">

**COUNT VI**
**BREACH OF FIDUCIARY DUTY**
**(On Behalf of Plaintiffs and the Class)**

</div>

246. Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

247. A relationship existed between Plaintiffs and the Class, on the one hand, and Defendant, on the other, in which Plaintiffs and the Class put their trust in Defendant to protect the Private Information of Plaintiffs and the Class, and Defendant accepted that trust.

248. Defendant breached the fiduciary duty that it owed to Plaintiffs and the Class

Members by failing to act with the utmost good faith, fairness, and honesty, failing to act with the highest and finest loyalty, and failing to protect, and intentionally disclosing, their Private Information.

249. Defendant's breach of fiduciary duty was a legal cause of injury-in-fact and damage to Plaintiffs and the Class.

250. But for Defendant's breach of fiduciary duty, the injury-in-fact and damage to Plaintiffs and the Class would not have occurred.

251. Defendant's breach of fiduciary duty contributed substantially to producing the damage to the Plaintiffs and the Class.

252. As a direct and proximate result of Defendant's breach of fiduciary duty, Plaintiffs and Class Members are entitled to and do demand actual, consequential, and nominal damages, injunctive relief, and all other relief allowed by law.

## COUNT VII
### VIOLATION OF THE TENNESSEE CONSUMER PROTECTION ACT
(Tenn. Code Ann. § 47-18-101, *et seq.*)
(On Behalf of Plaintiffs)

253. Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

254. Plaintiffs are each a "natural person" and "consumer" within the meaning of Tenn. Code Ann. § 47-18-103.

255. Defendant is a "person" within the meaning of Tenn. Code Ann. § 47-18-103.

256. Defendant's conduct complained of herein affected "trade," "commerce" or "consumer transactions" within the meaning of Tenn. Code Ann. § 47-18-103(23).

257. The Tennessee Consumer Protection Act ("Tennessee CPA") prohibits "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce," including but not limited to: "(5) Representing that goods or services have ... characteristics, [or] ... benefits ... that

they do not have…;" "(6) Representing that goods or services are of a particular standard, quality or grade… if they are of another;" "(9) Advertising goods or services with intent not to sell them as advertised" and "(12) Representing that a consumer transaction confers or involves rights, remedies or obligations that it does not have or involve . . . ." Tenn. Code Ann. § 47-18-104(b).

258. Defendant committed unfair and deceptive business practices, including but not limited to:

a. Encouraging patients to use Erlanger's Online Platforms while representing its commitment to protecting the privacy of the Private Information, and promising patients that it "would not use your information for marketing, [or] sell your information, […] without your written authorization."[102]

b. Despite these representations, Erlanger disclosed to third parties information relating to Plaintiffs' medical treatment, without their knowledge, consent, or authorization, as part of a scheme, artifice or device with the intent to mislead patients.

c. Plaintiffs relied on Defendant's representations in using its Online Platform and thought they were communicating only with their trusted healthcare providers.

d. By installing and implementing the Meta Pixel, and other tracking technology, Defendant knew or reasonably should have known they intercepted and transmitted Plaintiffs' communications from Plaintiffs' browsers directly to Facebook or other third parties. Likewise, by potentially installing or implementing CAPI, Defendant knew or reasonably

---

[102] *Id.* (emphasis added).

should have known that it recorded on its servers and transmitted to Facebook Plaintiff's and Class Member's confidential communications.

259. By engaging in the above conduct, Defendant intentionally "[r]epresent[ed] that goods or services have ... characteristics, [or] ... benefits ... that they do not have...;" "[r]epresent[ed] that goods or services are of a particular standard, quality or grade... if they are of another;" "[a]dvertis[ed] goods or services with intent not to sell them as advertised;" and "[r]epresent[d] that a ... transaction confer[ed] ... rights, remedies or obligations that it does not have ...." Tenn. Code Ann. § 47-18-104(b)(5)-(6), (9), (12).

260. Defendant's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs.

261. Defendant intentionally and knowingly misrepresented material facts regarding the services provided.

262. Defendant knew or should have known that their conduct was violative of the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-104.

263. Defendant owed a duty to disclose the true nature of the Disclosure of the Private Information of Plaintiffs which they solicited and which was entrusted to them.

264. Because Defendant fraudulently concealed the Disclosure of Plaintiffs' Private Information, consumers were deprived of the benefit of their bargain since the medical services and data security purchased were worth less than they would have been if those services had been provided without Disclosure of their Private Information.

265. As a direct and proximate result of Defendant's violations, Plaintiffs have suffered injury-in-fact and actual damages as alleged above. As a direct result of Defendant's misconduct, Plaintiffs incurred damages.

266. Pursuant to Tenn. Code Ann. § 47-18-109(a), Plaintiffs seek monetary relief against Defendant measured as actual damages in an amount to be determined at trial, treble damages as a result of Defendant's willful or knowing violations, and any other just and proper relief available under the Tennessee CPA.

<div align="center">

**COUNT VIII**
**VIOLATION OF TENN. CODE ANN. § 39-13-601**
**(On Behalf of Plaintiffs and the Class)**

</div>

267. Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

268. Tenn. Code Ann. § 39-13-601 provides that a person commits an offense who:

(A) Intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication;

. . .

(C) Intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection (a); or

(D) Intentionally uses, or endeavors to use, the contents of any wire, oral or electronic communication, knowing or having reason to know, that the information was obtained through the interception of a wire, oral or electronic communication in violation of this subsection (a).

Tenn. Code Ann. § 39-13-601(a)(1).

269. For purposes of Tenn. Code Ann. § 39-13-601 "intercept" is "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device[.]" Tenn. Code Ann. § 40-6-303(11).

270. Defendant intentionally acquired and intercepted Plaintiffs' and Class Members' electronic communications without the consent of the Plaintiffs and Class Members, using the Meta Pixel and other trackers, in violation of Tenn. Code Ann. § 39-13-601.

271. Defendant intentionally acquired and intercepted Plaintiffs' and Class Members' electronic communications for the purpose of disclosing those communications to third parties,

including Facebook, without the knowledge, consent, or written authorization of Plaintiffs or Class Members, in violation of Tenn. Code Ann. § 39-13-601.

272. Defendant aided in the acquisition and interception of communications between Plaintiffs and Class Members and Defendant that were redirected and disclosed to and recorded by third parties without the Plaintiffs' or Class Members' consent.

273. The devices used in this case, include, but are not limited to:

    a.    those to which Plaintiffs' and Class Members' communications were disclosed;

    b.    Plaintiffs' and Class Members' personal computing devices;

    c.    Plaintiffs' and Class Members' web browsers;

    d.    Plaintiffs' and Class Members' browser-managed files;

    e.    the Meta Pixel;

    f.    internet cookies;

    g.    other pixels, trackers, and/or tracking technology installed on Defendant's Website and/or server;

    h.    Defendant's computer servers;

    i.    third-party source code utilized by Defendant; and

    j.    computer servers of third parties (including Facebook).

274. Under Tenn. Code Ann. § 39-13-603, "any aggrieved person whose wire, oral or electronic communication is intentionally intercepted, disclosed, or used in violation of § 39-13-601 [...] may in a civil action recover from the person or entity that engaged in that violation the following relief:

(1) The greater of:

    (A) The sum of the actual damages, including any damage to personal or business reputation or relationships, suffered by the plaintiff and any profits made by the violator as a result of the violation; or

    (B) Statutory damages of one hundred dollars ($100) a day for each day of violation or ten thousand dollars ($10,000), whichever is greater;

(2) Punitive damages; and

(3) A reasonable attorney's fee and other litigation costs reasonably incurred.

Tenn. Code Ann. § 39-13-603(a).

275.    In addition to statutory damages, Defendant's violations of Tenn. Code Ann. § 39-13-601, caused Plaintiffs and Class Members the following damages:

    a.    Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

    b.    Defendant eroded the essential confidential nature of the doctor-patient relationship;

    c.    Defendant took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without sharing the benefit of such value;

    d.    Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality; and

    e.    Defendant's actions diminished the value of Plaintiffs' and Class Members' personal information.

276.    Plaintiffs and the Class Members seek actual damages or statutory damages, whichever is greater, arising from Defendant's violations of Tenn. Code Ann. § 39-13-601,

punitive damages, as well as reasonable attorneys' fees and costs.

277.    Plaintiffs and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, JANE DOE, JOHN DOE, JACK DOE, and JANET DOE, Individually, on behalf of themselves, and on behalf of all others similarly situated, pray for judgment as follows:

A.    for an Order certifying this action as a Class action and appointing Plaintiffs as Class Representatives and Plaintiffs' counsel as Class Counsel;

B.    for an award of actual damages, compensatory damages, statutory damages and statutory penalties, in an amount to be determined, as allowable by law;

C.    for an award of punitive damages, as allowable by law;

D.    for equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and Class Members' Private Information and from refusing to issue prompt, complete and accurate disclosures to Plaintiffs and Class Members;

E.    for equitable relief compelling Defendant to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety and to disclose with specificity the type of Private Information compromised and unlawfully disclosed to third parties;

F.    for equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

G.    an order Defendant to pay for not less than three years of credit monitoring

services for Plaintiffs and the Class;

H.  for an award of attorneys' fees under the common fund doctrine, and any other applicable law;

I.  costs and any other expenses, including expert witness fees incurred by Plaintiffs in connection with this action;

J.  pre- and post-judgment interest on any amounts awarded; and

K.  such other and further relief as this court may deem just and proper.

## JURY DEMAND

Plaintiffs, on behalf of themselves, and all others similarly situated, hereby demand a trial by jury on all issues so triable.

Dated: October 31, 2023   Respectfully submitted,

J. Gerard Stranch, IV (BPR No. 023045)
Andrew E. Mize (*Pro Hac Vice* forthcoming)
STRANCH, JENNINGS & GARVEY, PLLC
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203
(615) 254-8801
(615) 255-5419 (facsimile)
gstranch@stranchlaw.com
amize@stranchlaw.com

Lynn A. Toops (Pro Hac Vice forthcoming)
Mary Kate Dugan (Pro Hac Vice forthcoming)
COHEN & MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, Indiana 46204
(317) 636-6481
ltoops@cohenandmalad.com
mdugan@cohenandmalad.com

Samuel J. Strauss (*Pro Hac Vice* forthcoming)
Raina Borelli (*Pro Hac Vice* forthcoming)

TURKE & STRAUSS, LLP
613 Williamson St., Suite 201
Madison, Wisconsin 53703
(608) 237-1775
(608) 509-4423 (facsimile)
sam@turkestrauss.com
raina@turkestrauss.com

*Counsel for Plaintiffs and the Proposed Class*

 

July 20, 2023

[Company]
[Address]
[City, State, Zip Code]
Attn: [Name of Recipient]

    Re:    Use of Online Tracking Technologies

Dear [Name of Recipient],

The Office for Civil Rights (OCR) at the U.S. Department of Health and Human Services (HHS) and the Federal Trade Commission (FTC) are writing to draw your attention to serious privacy and security risks related to the use of online tracking technologies that may be present on your website or mobile application (app) and impermissibly disclosing consumers' sensitive personal health information to third parties.

Recent research,[1] news reports,[2] FTC enforcement actions,[3] and an OCR bulletin[4] have highlighted risks and concerns about the use of technologies, such as the Meta/Facebook pixel and Google Analytics, that can track a user's online activities. These tracking technologies

---

[1] *See, e.g.*, Mingjia Huo, Maxwell Bland, and Kirill Levchenko, *All Eyes on Me: Inside Third Party Trackers' Exfiltration of PHI from Healthcare Providers' Online Systems*, Proceedings of the 21st Workshop on Privacy in the Electronic Society (Nov. 7, 2022), https://dl.acm.org/doi/10.1145/3559613.3563190.

[2] *See, e.g.*, Todd Feathers, Katie Palmer, and Simon Fondrie-Teitler, *Out of Control: Dozens of Telehealth Startups Sent Sensitive Health Information to Big Tech Companies*, THE MARKUP (Dec. 13, 2022), https://themarkup.org/pixel-hunt/2022/12/13/out-of-control-dozens-of-telehealth-startups-sent-sensitive-health-information-to-big-tech-companies.

[3] *U.S. v. Easy Healthcare Corp.*, Case No. 1:23-cv-3107 (N.D. Ill. 2023), https://www.ftc.gov/legal-library/browse/cases-proceedings/202-3186-easy-healthcare-corporation-us-v; *In the Matter of BetterHelp, Inc.*, FTC Dkt. No. C-4796 (July 14, 2023), https://www.ftc.gov/legal-library/browse/cases-proceedings/2023169-betterhelp-inc-matter; *U.S. v. GoodRx Holdings, Inc.*, Case No. 23-cv-460 (N.D. Cal. 2023), https://www.ftc.gov/legal-library/browse/cases-proceedings/2023090-goodrx-holdings-inc; *In the Matter of Flo Health Inc.*, FTC Dkt. No. C-4747 (June 22, 2021), https://www.ftc.gov/legal-library/browse/cases-proceedings/192-3133-flo-health-inc.

[4] U.S. Dept. of Health and Human Svcs. Office for Civil Rights, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (Dec. 1, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

gather identifiable information about users as they interact with a website or mobile app, often in ways which are not avoidable by and largely unknown to users.

Impermissible disclosures of an individual's personal health information to third parties may result in a wide range of harms to an individual or others. Such disclosures can reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, where an individual seeks medical treatment, and more. In addition, impermissible disclosures of personal health information may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others.

## Health Insurance Portability and Accountability Act of 1996 (HIPAA)

If you are a covered entity or business associate ("regulated entities") under HIPAA, you must comply with the HIPAA Privacy, Security, and Breach Notification Rules (HIPAA Rules), with regard to protected health information (PHI) that is transmitted or maintained in electronic or any other form or medium.

The HIPAA Rules apply when the information that a regulated entity collects through tracking technologies or discloses to third parties (*e.g.*, tracking technology vendors) includes PHI. HIPAA regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to third parties or any other violations of the HIPAA Rules. OCR's December 2022 bulletin about the use of online tracking technologies by HIPAA regulated entities provides a general overview of how the HIPAA Rules apply.[5] This bulletin discusses what tracking technologies are and reminds regulated entities of their obligations to comply with the HIPAA Rules when using tracking technologies.

## FTC Act and FTC Health Breach Notification Rule

Even if you are not covered by HIPAA, you still have an obligation to protect against impermissible disclosures of personal health information under the FTC Act and the FTC Health Breach Notification Rule. This is true even if you relied upon a third party to develop your website or mobile app and even if you do not use the information obtained through use of a tracking technology for any marketing purposes. As recent FTC enforcement actions demonstrate, it is essential to monitor data flows of health information to third parties via technologies you have integrated into your website or app.[6] The disclosure of such information without a consumer's authorization can, in some circumstances, violate the FTC Act as well as constitute a breach of security under the FTC's Health Breach Notification Rule.[7] Within the last

---

[5] *Id.*

[6] *See supra* note 3.

[7] *See* Federal Trade Comm'n, *Statement of the Commission on Breaches by Health Apps and Other Connected Devices* (Sept. 15, 2021), https://www.ftc.gov/system/files/documents/public_statements/1596364/statement_of_the_commission_on_breaches_by_health_apps_and_other_connected_devices.pdf.

few months, the FTC has issued a series of guidance pieces addressed to entities collecting, using, or disclosing sensitive health information.[8]

OCR and the FTC remain committed to ensuring that consumers' health privacy remains protected with respect to this critical issue. Both agencies are closely watching developments in this area. To the extent you are using the tracking technologies described in this letter on your website or app, we strongly encourage you to review the laws cited in this letter and take actions to protect the privacy and security of individuals' health information.[9]

Sincerely,

/s/

Melanie Fontes Rainer
Director
Office for Civil Rights
U.S. Department of Health and Human Services

/s/

Samuel Levine
Director
Bureau of Consumer Protection
Federal Trade Commission

---

[8] *See, e.g.*, FTC Office of Technology, *Lurking Beneath the Surface: Hidden Impacts of Pixel Tracking* (Mar. 16, 2023), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/03/lurking-beneath-surface-hidden-impacts-pixel-tracking; Lesley Fair, *First FTC Health Breach Notification Rule case addresses GoodRx's not-so-good privacy practices* (Feb. 1, 2023), https://www.ftc.gov/business-guidance/blog/2023/02/first-ftc-health-breach-notification-rule-case-addresses-goodrxs-not-so-good-privacy-practices; Federal Trade Comm'n and the U.S. Department of Health & Human Services' Office of the National Coordinator for Health Information Technology (ONC), Office for Civil Rights (OCR), and Food and Drug Administration (FDA), *Mobile Health App Interactive Tool* (Dec. 2022), https://www.ftc.gov/business-guidance/resources/mobile-health-apps-interactive-tool; Kristin Cohen, *Location, health, and other sensitive information: FTC Committed to fully enforcing the law against illegal use and sharing of highly sensitive data* (July 11, 2022), https://www.ftc.gov/business-guidance/blog/2022/07/location-health-and-other-sensitive-information-ftc-committed-fully-enforcing-law-against-illegal.

[9] In addition to the HIPAA Rules, the FTC Act, and the FTC Health Breach Notification Rule, you may also be subject to other state or federal statutes that prohibit the disclosure of personal health information.



EXHIBIT C

Status ( Active ) PolicyStat ID ( 13399197 )



| | | | |
|---|---|---|---|
| Origination | 10/2005 | Owner | Jackie Bishop: Medical Staff QI Director |
| Last Approved | 04/2023 | | |
| Effective | 04/2023 | Area | Administration |
| Last Revised | 03/2023 | Applicability | System Wide Policies |
| Next Review | 04/2026 | | |

## Patient Rights

# 1. Policy Statement

Erlanger is committed to recognizing and respecting that each patient is an individual with unique health care needs. We are also committed to providing compassionate care at each touch point. Erlanger does not tolerate any form of harassment or discrimination.

# 2. Who Should Read This Policy?

All EHS workforce, including contract personnel

# 3. Purpose

EHS should inform patients of their rights and responsibilities as a patient at EHS. When possible, patients will be provided with the notice of patient rights pamphlets during the registration process.

# 4. Definitions

N/A

# 5. The Policy

The following patient rights will be provided, when possible, during the registration process:

**You, the patient, have the right to:**

- Be treated without regard to your race, nationality, religion, beliefs, age, disability, sex, sexual orientation, gender identity or expression, or any other basis prohibited by federal, state, or local law.

- Have language services provided to you in your primary language during the delivery of all

significant healthcare services at no cost.

**You have the right to considerate and respectful care, including the right to:**

- Be safe from abuse or harassment.
- Wear appropriate clothing or cultural or religious items as long as doing this does not interfere with your treatment.
- See your bills and have them explained to you.
- Have your complaints handled fairly. Your care will not be affected if you share any complaints with us.

**You have the right to privacy, including the right to:**

- Receive care in an environment that preserves dignity and contributes to a positive self-image.
- Have the contents of your medical record protected, whether oral or in paper or electronic format, from unauthorized disclosure.
- Not have any photos or videos taken of you unless you agree to this, except as needed to treat you.

**You have the right to be involved in all aspects of your care. This includes the right to:**

- Participate in your treatment/care plan, discharge plan and/or pain management plan.
- Have your wishes for advance care (living will, power of attorney) or organ donation followed.
- Refuse tests or treatment.
- Leave the hospital (unless prohibited by law) and to be told what might happen if you do. If you leave the hospital against medical advice, we will not be responsible for any medical or financial issues that may result.
- Have a support person of your choice with you in the hospital or clinic exam room unless the presence of that person interferes with your care or other patients' care.

**To keep you safe, we encourage you and your family to become actively involved in your care by:**

- Confirming to us which part of your body will be operated on.
- Confirming we check your ID band before we give you medicine or blood.
- Confirming we clean our hands before caring for you. You may ask us to clean our hands if you don't see us clean them before caring for you.
- Confirming we are wearing our ID badge.
- Asking questions.
- Understanding the medicines you are taking and why.

**It is your responsibility to:**

- Give us truthful and complete information about your health, medicines, and insurance.
- Ask any questions you may have about your treatment and what you need to do to take care of yourself.
- Follow your treatment plan.

- Give us a copy of any living will, power of attorney, or donor forms you may have.
- Follow all hospital and clinic rules, including the no smoking policy.
- Maintain the privacy of staff, other patients, and visitors by not recording or photographing them without their consent.
- Accept that bad language or bad behavior will not be tolerated and may be grounds for your removal from the facility if not an emergency.
- Respect other patients, visitors, staff, and property.
- Tell us if you are concerned about or notice any changes in your condition.
- Go to all of your appointments and be on time.
- Let us know if you are concerned about your privacy.

**If you have concerns or complaints:**

- Please share your complaints and concerns with:
    - The staff delivering your care
    - The department manager
    - Erlanger's Office of Patient Experience at 423-778-7990
    - www.erlanger.org/contact-us/contact-us-erlanger or at OPE@erlanger.org
- If you have a concern regarding the quality of your care or about patient safety and our management staff has been unable to help you resolve that concern, you may contact:
    - DNV provides five channels for submitting a hospital complaint:
      Website: https://www.dnvhealthcareportal.com/patient-complaint-report
      Email: hospitalcomplaint@dnv.com
      Phone: 866-496-9647
      Fax: 281-870-4818
      Mail: DNV Healthcare USA Inc., Attn: Hospital Complaints, 4435 Aicholt Road, Suite 900, Cincinnati, OH 45245
    - The Department of Health can be contacted at 1-800-852-2178 or by mail at TN Department of Health, Office of Investigation, 665 Mainstream Drive, 2nd Floor, Suite 201, Nashville, TN 37243.
    - If you have TennCare and have problems getting medical care, ask for a copy of the TennCare medical appeal form. You may also contact TNCARE Solutions, PO Box 593, Nashville, TN 37202-0593, Phone: 800-878-3192, TTY/TDD: 800-772-7647
    - The Chattanooga-Hamilton County Hospital Authority dba Erlanger Health System complies with the Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, and the Age Discrimination Act of 1975. No individual shall, on the grounds of race, sex, color, creed, national origin, age or handicap be kept from participating, be denied the benefits of, or be otherwise discriminated against, under any programs or services offered by Erlanger. Concerns regarding Erlanger's noncompliance with referenced laws may be reported to the Integrity Line 1-877-849-8338.

# References:

National Integrated Accreditation for Healthcare Organizations (NIAHO), Rev. 20.1, 09/21/20

National Integrated Accreditation for Healthcare Organizations, Critical Access Hospital (NIAHO, CAH), Rev. 20.1, 11/09/20.

## Attachments

EHS0099_PatientRights_8.5x11Flyer_ENG_0223.pdf

EHS0099_PatientRights_8.5x11Flyer_SPA_0223.pdf

## Approval Signatures

| Step Description | Approver | Date |
|---|---|---|
| Final Approval | Adam Campbell: VP, Patient Safety & Quality | 04/2023 |
| | Jackie Bishop: Medical Staff QI Director | 03/2023 |

## IN THE CHANCERY COURT FOR THE ELEVENTH JUDICIAL DISTRICT
## HAMILTON COUNTY, TENNESSEE

JANE DOE, JOHN DOE, JACK DOE, )
and JANET DOE, individually, on )
behalf of themselves, and all others )
similarly situated, )
 )
  Plaintiffs, )
 )
 )
v. ) Case No: **23-0730**
 )
 )
ERLANGER HEALTH d/b/a )
ERLANGER HEALTH SYSTEM ) All Part 2 Motions will be heard either in person
 ) or via WebEx beginning at 1:30 pm on NOVEMBER 13, 2023.
 ) To participate by WebEx, the meeting ID # is 286561663.
  Defendant )

### PLAINTIFF JANET DOE'S MOTION FOR PERMISSION

### TO PROCEED UNDER PSEUDONYM

Plaintiff, JANET DOE, individually, on behalf of themselves, and all others similarly situated, by and through counsel, respectfully moves the Court to proceed pseudonyms, stating as follows:

1. This case arises from the non-consensual intrusion into and disclosure of Plaintiff's personal and private matters – namely their protected health information.

2. Plaintiff requests permission to proceed under a pseudonym to protect her identity and her medical information from further public disclosure.

3. Plaintiff also moves the court to order Defendant to maintain the confidentiality of her identity by using only pseudonyms in all of its filings, including all exhibits in which her name appears.

4. Plaintiff JANET DOE is an adult female citizen of Tennessee.

5. The Complaint ("Complaint") was filed on November 1, 2023.

6. Plaintiff will disclose her identity to the Court and Defendant

2023 NOV -1 AM 9: 08

FILED
HAMILTON CO CLERK & MASTER

7. As a result of the nature of the claims of this case and the damages alleged, this case necessarily involves the filing and disclosure of Plaintiff's health status, diagnoses and seeking medical treatment.

8. Plaintiff used a pseudonym to protect her identity from being released due to the highly personal and potentially stigmatizing medical information in this action, and the desire to prevent her private personal medical information from being spread further.

9. There are several factors which weigh in favor of allowing Plaintiff to proceed pseudonymously and entering an order that all parties use Plaintiff's pseudonym in all documents.

10. The first is the potential for embarrassment and social stigmatization given the nature of the Complaint regarding the health, treatment, diagnoses, and care sought by Plaintiff.

11. Moreover, Plaintiff's claims are an intrusion upon seclusion into Plaintiff's private and personal affairs. By allowing Plaintiff to proceed pseudonymously, Plaintiff seeks to limit their damages further, by limiting, to the extent possible, the necessity of their names on public dockets and filings with their medical records.

12. Additionally, there is a lack of any prejudice to Defendant, actual or otherwise. Courts routinely enter orders protecting the personal medical information of parties which include forbidding the disclosure of identifiable personal information or personal identifiable information.

13. Plaintiff does not seek to seal the case, nor does she desire the facts to be shielded from the public eye — Plaintiff merely seeks to prevent the disclosure of her actual name as part of a public record.

14. There is no public interest in the disclosure of the Plaintiff's identity.

15. For the reasons stated above, Plaintiff seeks an order requesting permission to proceed under a pseudonym to protect her identity from public disclosure. As stated, Plaintiff will disclose her identity to the Court and the Defendant.

16. Plaintiff also moves the court to order Defendant to maintain the confidentiality of her identity by using only a pseudonym in all of its filings, including all exhibits in which their name appears.

17. The Affidavit of Plaintiff's Counsel is attached to this Motion.

Dated: October 31, 2023

Respectfully submitted,

J. Gerard Stranch, IV (BPR No. 023045)
Andrew E. Mize (*Pro Hac Vice* forthcoming)
STRANCH, JENNINGS & GARVEY, PLLC
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203
(615) 254-8801
(615) 255-5419 (facsimile)
gstranch@stranchlaw.com
amize@stranchlaw.com

Lynn A. Toops (Pro Hac Vice forthcoming)
Mary Kate Dugan (Pro Hac Vice forthcoming)
COHEN & MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, Indiana 46204
(317) 636-6481
ltoops@cohenandmalad.com
mdugan@cohenandmalad.com

Samuel J. Strauss (*Pro Hac Vice* forthcoming)
Raina Borelli (*Pro Hac Vice* forthcoming)
TURKE & STRAUSS, LLP
613 Williamson St., Suite 201
Madison, Wisconsin 53703
(608) 237-1775
(608) 509-4423 (facsimile)
sam@turkestrauss.com

*Counsel for Plaintiffs and the Proposed Class*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing Plaintiff Janet Doe's Motion for Permission to Proceed Under Pseudonym is being served alongside the Summons and Complaint to the Defendant:

Erlanger Health
National Registered Agents, Inc. 300 Montvue Road
Knoxville, TN 37919-5546
*Registered Agent for Defendant Erlanger Health*

_____

J. Gerard Stranch. IV

## IN THE CHANCERY COURT FOR THE ELEVENTH JUDICIAL DISTRICT
## HAMILTON COUNTY, TENNESSEE

JANE DOE, JOHN DOE, JACK DOE, )
and JANET DOE, individually, on )
behalf of themselves, and all others )
similarly situated, )
)
      Plaintiffs, )   CASE NO. **23-0730**
)
v. )
)
ERLANGER HEALTH d/b/a )
ERLANGER HEALTH SYSTEM )
)
      Defendant.

## AFFIDAVIT OF J. GERARD STRANCH, IV IN SUPPORT OF
## PLAINTIFF JANET DOE'S MOTION FOR PERMISSION TO PROCEED UNDER A
## PSEUDONYM

I, J. GERARD STRANCH, IV, after having been duly sworn, state as follows:

1.    I am over twenty-one (21) years of age.

2.    I am competent to testify to the matters stated herein.

3.    I have personal knowledge of the matters contained herein.

4.    I am the managing partner of the law firm of Stranch, Jennings & Garvey, PLLC, headquartered in Nashville, Tennessee. My firm represents Plaintiff Janet Doe in this lawsuit.

5.    I respectfully submit this Affidavit in support of the Plaintiff's Motion to Proceed Under a Pseudonym.

6.    Plaintiff Janet Doe is a citizen of Tennessee.

7.    This case arises from the non-consensual intrusion into and disclosure of Plaintiff personal and private matters—namely their protected health information—by the Defendant.

8.    Plaintiff desires to proceed under a pseudonym to protect her identity and medical information from further public disclosure, in the interest of preventing embarrassment and social

stigmatization and harm given the nature of the Complaint regarding the health, treatment, diagnoses, and care sought by Plaintiff.

9. There is no public interest in the disclosure of Plaintiff's identity, and Plaintiff does not seek to seal this case, or shield facts from the public, but only to prevent disclosure of her actual name.

10. Plaintiff will disclose her identity to the Court and to the Defendant.

11. No prejudice will be caused to Defendant by the Court allowing Plaintiff to proceed pseudonymously.

*Further Affiant sayeth naught.*

_____
J. Gerard Stranch, IV

State of Tennessee

County of Davidson

On this **31** day of October 2023, before me personally appeared J. Gerard Stranch, IV to me known to be the person described in and who executed the foregoing instrument, and acknowledged that such person executed the same as such person free act and deed.

Witness my hand, at office, this **31** day of **OCTOBER**, 20**23**.

_____
Notary's Signature

My commission expires: **10/16/2024**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing Affidavit of J. Gerard Stranch, IV In

Support of Plaintiff Janet Doe's Motion for Permission to Proceed Under a Pseudonym is being

served alongside the Summons and Complaint to the Defendant:

Erlanger Health
National Registered Agents, Inc. 300 Montvue Road
Knoxville, TN 37919-5546
*Registered Agent for Defendant Erlanger Health*

_____
J. Gerard Stranch. IV

IN THE CHANCERY COURT FOR THE ELEVENTH JUDICIAL DISTRICT
HAMILTON COUNTY, TENNESSEE

| | | |
|---|---|---|
| JANE DOE, JOHN DOE, JACK DOE, and JANET DOE, individually, on behalf of themselves, and all others similarly situated,<br><br>    Plaintiffs,<br><br>v.<br><br>ERLANGER HEALTH d/b/a ERLANGER HEALTH SYSTEM<br><br>    Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No: 23-0730 _____<br><br>All Part 2 Motions will be heard either in person or via WebEx beginning at 1:30 pm on NOVEMBER 13, 2023. To participate by WebEx, the meeting ID # is 286561663. |

## PLAINTIFF JANE DOE'S MOTION

## FOR PERMISSION TO PROCEED UNDER PSEUDONYM

Plaintiff, JANE DOE, individually, on behalf of themselves, and all others similarly situated, by and through counsel, respectfully moves the Court to proceed pseudonyms, stating as follows:

1.  This case arises from the non-consensual intrusion into and disclosure of Plaintiff's personal and private matters – namely their protected health information.

2.  Plaintiff requests permission to proceed under a pseudonym to protect her identity and her medical information from further public disclosure.

3.  Plaintiff also moves the court to order Defendant to maintain the confidentiality of her identity by using only pseudonyms in all of its filings, including all exhibits in which her name appears.

4.  Plaintiff JANE DOE is an adult female citizen of Tennessee.

5.  The Complaint ("Complaint") was filed on November 1, 2023.

6.  Plaintiff will disclose her identity to the Court and Defendant.

2023 NOV -1 AH 9:06

FILED
HAMILTON CO CLERK & MASTER

7. As a result of the nature of the claims of this case and the damages alleged, this case necessarily involves the filing and disclosure of Plaintiff's health status, diagnoses and seeking medical treatment.

8. Plaintiff used a pseudonym to protect her identity from being released due to the highly personal and potentially stigmatizing medical information in this action, and the desire to prevent her private personal medical information from being spread further.

9. There are several factors which weigh in favor of allowing Plaintiff to proceed pseudonymously and entering an order that all parties use Plaintiff's pseudonym in all documents.

10. The first is the potential for embarrassment and social stigmatization given the nature of the Complaint regarding the health, treatment, diagnoses, and care sought by Plaintiff.

11. Moreover, Plaintiff's claims are an intrusion upon seclusion into Plaintiff's private and personal affairs. By allowing Plaintiff to proceed pseudonymously, Plaintiff seeks to limit their damages further, by limiting, to the extent possible, the necessity of their names on public dockets and filings with their medical records.

12. Additionally, there is a lack of any prejudice to Defendant, actual or otherwise. Courts routinely enter orders protecting the personal medical information of parties which include forbidding the disclosure of identifiable personal information or personal identifiable information.

13. Plaintiff does not seek to seal the case, nor does she desire the facts to be shielded from the public eye — Plaintiff merely seeks to prevent the disclosure of her actual name as part of a public record.

14. There is no public interest in the disclosure of the Plaintiff's identity.

15. For the reasons stated above, Plaintiff seeks an order requesting permission to proceed under a pseudonym to protect her identity from public disclosure. As stated, Plaintiff will disclose her identity to the Court and the Defendant.

16. Plaintiff also moves the court to order Defendant to maintain the confidentiality of her identity by using only a pseudonym in all of its filings, including all exhibits in which their name appears.

17. The Affidavit of Plaintiff's Counsel is attached to this Motion.

Dated: October 31, 2023          Respectfully submitted,

J. Gerard Stranch, IV (BPR No. 023045)
Andrew E. Mize (*Pro Hac Vice* forthcoming)
STRANCH, JENNINGS & GARVEY, PLLC
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203
(615) 254-8801
(615) 255-5419 (facsimile)
gstranch@stranchlaw.com
amize@stranchlaw.com

Lynn A. Toops (Pro Hac Vice forthcoming)
Mary Kate Dugan (Pro Hac Vice forthcoming)
COHEN & MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, Indiana 46204
(317) 636-6481
ltoops@cohenandmalad.com
mdugan@cohenandmalad.com

Samuel J. Strauss (*Pro Hac Vice* forthcoming)
Raina Borelli (*Pro Hac Vice* forthcoming)
TURKE & STRAUSS, LLP
613 Williamson St., Suite 201
Madison, Wisconsin 53703
(608) 237-1775
(608) 509-4423 (facsimile)
sam@turkestrauss.com

raina@turkestrauss.com

*Counsel for Plaintiffs and the Proposed Class*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing Plaintiff Jane Doe's Motion for Permission to Proceed Under Pseudonyms is being served alongside the Summons and Complaint to the Defendant:

Erlanger Health
National Registered Agents, Inc.
300 Montvue Road
Knoxville, TN 37919-5546
*Registered Agent for Defendant Erlanger Health*

J. Gerard Stranch. IV

# IN THE CHANCERY COURT FOR THE ELEVENTH JUDICIAL DISTRICT
## HAMILTON COUNTY, TENNESSEE

JANE DOE, JOHN DOE, JACK DOE, )
and JANET DOE, individually, on )
behalf of themselves, and all others )
similarly situated, )
           )
        Plaintiffs, )
           ) CASE NO. **23-0730**
v. )
           )
ERLANGER HEALTH d/b/a )
ERLANGER HEALTH SYSTEM )
           )
        Defendant. )

## AFFIDAVIT OF J. GERARD STRANCH, IV IN SUPPORT OF PLAINTIFF JANE DOE'S MOTION FOR PERMISSION TO PROCEED UNDER A PSEUDONYM

I, J. GERARD STRANCH, IV, after having been duly sworn, state as follows:

1. I am over twenty-one (21) years of age.

2. I am competent to testify to the matters stated herein.

3. I have personal knowledge of the matters contained herein.

4. I am the managing partner of the law firm of Stranch, Jennings & Garvey, PLLC, headquartered in Nashville, Tennessee. My firm represents Plaintiff Jane Doe in this lawsuit.

5. I respectfully submit this Affidavit in support of the Plaintiff's Motion to Proceed Under a Pseudonym.

6. Plaintiff Jane Doe is a citizen of Tennessee.

7. This case arises from the non-consensual intrusion into and disclosure of Plaintiff's personal and private matters—namely their protected health information—by the Defendant.

8. Plaintiff desires to proceed under a pseudonym to protect her identity and medical information from further public disclosure, in the interest of preventing embarrassment and social

2023 NOV -1 AM 9: 06

FILED
HAMILTON CO CLERK & MASTER

stigmatization and harm given the nature of the Complaint regarding the health, treatment, diagnoses, and care sought by Plaintiff.

9. There is no public interest in the disclosure of Plaintiff's identity, and Plaintiff does not seek to seal this case, or shield facts from the public, but only to prevent disclosure of her actual name.

10. Plaintiff will disclose her identity to the Court and to the Defendant.

11. No prejudice will be caused to Defendant by the Court allowing Plaintiff to proceed pseudonymously.

*Further Affiant sayeth naught.*

_____
J. Gerard Stranch, IV

State of Tennessee

County of Davidson

On this **31** day of October 2023, before me personally appeared J. Gerard Stranch, IV to me known to be the person described in and who executed the foregoing instrument, and acknowledged that such person executed the same as such person free act and deed.

Witness my hand, at office, this **31** day of **OCTOBER**, 20**23**.

_____
Notary's Signature

My commission expires: **10/16/2024**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing Affidavit of J. Gerard Stranch, IV In Support of Plaintiff Jane Doe's Motion for Permission to Proceed Under a Pseudonym is being served alongside the Summons and Complaint to the Defendant:

Erlanger Health
National Registered Agents, Inc. 300 Montvue Road
Knoxville, TN 37919-5546
*Registered Agent for Defendant Erlanger Health*

J. Gerard Stranch. IV

RECEIVED
11-1-2023
Clerk & Master



# IN THE CHANCERY COURT FOR THE ELEVENTH JUDICIAL DISTRICT
## HAMILTON COUNTY, TENNESSEE

JANE DOE, JOHN DOE, JACK DOE, )
and JANET DOE, individually, on )
behalf of themselves, and all others )
similarly situated, )
                               )
         Plaintiffs,      )   CASE NO. **23-0730**
                               )
v.                           )
                               )
ERLANGER HEALTH d/b/a )
ERLANGER HEALTH SYSTEM )
                               )
         Defendant.

## ORDER ALLOWING PLAINTIFF JANE DOE TO PROCEED BY PSEUDONYM

Plaintiff, by and through her counsel, filed this action on November 1, 2023 and filed a motion for Plaintiff Jane Doe to proceed by pseudonym. Upon review of the motion, statements of the parties, and the entire record in this case, the Court finds as follows:

1. This action involves highly private and sensitive facts related to the nature of the claims and the damages alleged, which include the disclosure of Plaintiff's health status, diagnoses and highly personal identify information;

2. Plaintiff faces embarrassment and harm if publicly identified as party to this action;

3. It is necessary to allow Plaintiff to proceed by pseudonym to protect her identity; and

4. There will be no prejudice to any party or public by allowing Plaintiff to proceed by pseudonym.

**IT IS THEREFORE ORDERED** that the Plaintiff be allowed to proceed by her pseudonym, *to wit*: Jane Doe.

Entered this _____ day of _____, 2023.

_____
Judge

Approved for entry by:

_J. Gerard Stranch, IV (#23045)_
J. Gerard Stranch, IV (#23045)
Andrew E. Mize (*Pro Hac Vice* forthcoming)
**STRANCH, JENNINGS & GARVEY, PLLC**
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203
(615) 254-8801
(615) 255-5419 (facsimile)
gstranch@stranchlaw.com
amize@stranchlaw.com

Lynn A. Toops (*Pro Hac Vice* forthcoming)
Mary Kate Dugan (*Pro Hac Vice* forthcoming)
**COHEN & MALAD, LLP**
One Indiana Square, Suite 1400
Indianapolis, Indiana 46204
(317) 636-6481
ltoops@cohenandmalad.com
MDugan@cohenandmalad.com

Samuel J. Strauss (*Pro Hac Vice* forthcoming)
Raina Borelli (*Pro Hac Vice* forthcoming)
**TURKE & STRAUSS, LLP**
613 Williamson St., Suite 201
Madison, Wisconsin 53703
(608) 237-1775
(608) 509-4423 (facsimile)
sam@turkestrauss.com
raina@turkestrauss.com

*Counsel for Plaintiff and the Proposed Class*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing (Proposed) Order Allowing Plaintiff

Jane Doe to Proceed by Pseudonym is being served alongside the Summons and Complaint to the

Defendant:

Erlanger Health
National Registered Agents, Inc. 300 Montvue Road
Knoxville, TN 37919-5546
*Registered Agent for Defendant Erlanger Health*

J. Gerard Stranch, IV

# IN THE CHANCERY COURT FOR THE ELEVENTH JUDICIAL DISTRICT
## HAMILTON COUNTY, TENNESSEE

JANE DOE, JOHN DOE, JACK DOE, ) 
and JANET DOE, individually, on )
behalf of themselves, and all others )
similarly situated, )
                     )
     Plaintiffs, )
                     )
v. )   Case No: 23-0730
                     )
ERLANGER HEALTH d/b/a )
ERLANGER HEALTH SYSTEM )   All Part 2 Motions will be heard either in person
                     )   or via WebEx beginning at 1:30 pm on NOVEMBER 13, 2023.
     Defendant )   To participate by WebEx, the meeting ID # is 286561663.

## PLAINTIFF JOHN DOE'S MOTION FOR PERMISSION
## TO PROCEED UNDER PSEUDONYM

Plaintiff, JOHN DOE, individually, on behalf of themselves, and all others similarly situated, by and through counsel, respectfully moves the Court to proceed pseudonyms, stating as follows:

1. This case arises from the non-consensual intrusion into and disclosure of Plaintiff's personal and private matters – namely their protected health information.

2. Plaintiff requests permission to proceed under a pseudonym to protect his identity and his medical information from further public disclosure.

3. Plaintiff also moves the court to order Defendant to maintain the confidentiality of his identity by using only pseudonyms in all of its filings, including all exhibits in which his name appears.

4. Plaintiff JOHN DOE is an adult male citizen of Tennessee.

5. The Complaint ("Complaint") was filed on November 1, 2023.

6. Plaintiff will disclose his identity to the Court and Defendant

2023 NOV -1 AM 9: 07

FILED
HAMILTON CO CLERK & MASTER

7. As a result of the nature of the claims of this case and the damages alleged, this case necessarily involves the filing and disclosure of Plaintiff's health status, diagnoses and seeking medical treatment.

8. Plaintiff used a pseudonym to protect his identity from being released due to the highly personal and potentially stigmatizing medical information in this action, and the desire to prevent his private personal medical information from being spread further.

9. There are several factors which weigh in favor of allowing Plaintiff to proceed pseudonymously and entering an order that all parties use Plaintiff's pseudonym in all documents.

10. The first is the potential for embarrassment and social stigmatization given the nature of the Complaint regarding the health, treatment, diagnoses, and care sought by Plaintiff.

11. Moreover, Plaintiff's claims are an intrusion upon seclusion into Plaintiff's private and personal affairs. By allowing Plaintiff to proceed pseudonymously, Plaintiff seeks to limit their damages further, by limiting, to the extent possible, the necessity of their names on public dockets and filings with their medical records.

12. Additionally, there is a lack of any prejudice to Defendant, actual or otherwise. Courts routinely enter orders protecting the personal medical information of parties which include forbidding the disclosure of identifiable personal information or personal identifiable information.

13. Plaintiff does not seek to seal the case, nor does he desire the facts to be shielded from the public eye — Plaintiff merely seeks to prevent the disclosure of his actual name as part of a public record.

14. There is no public interest in the disclosure of the Plaintiff's identity.

15. For the reasons stated above, Plaintiff seeks an order requesting permission to proceed under a pseudonym to protect his identity from public disclosure. As stated, Plaintiff will disclose his identity to the Court and the Defendant.

16. Plaintiff also moves the court to order Defendant to maintain the confidentiality of his identity by using only a pseudonym in all of its filings, including all exhibits in which their name appears.

17. The Affidavit of Plaintiff's Counsel is attached to this Motion.

Dated: October 31, 2023

Respectfully submitted,

J. Gerard Stranch, IV (BPR No. 023045)
Andrew E. Mize (*Pro Hac Vice* forthcoming)
STRANCH, JENNINGS & GARVEY, PLLC
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203
(615) 254-8801
(615) 255-5419 (facsimile)
gstranch@stranchlaw.com
amize@stranchlaw.com

Lynn A. Toops (Pro Hac Vice forthcoming)
Mary Kate Dugan (Pro Hac Vice forthcoming)
COHEN & MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, Indiana 46204
(317) 636-6481
ltoops@cohenandmalad.com
mdugan@cohenandmalad.com

Samuel J. Strauss (*Pro Hac Vice* forthcoming)
Raina Borelli (*Pro Hac Vice* forthcoming)
TURKE & STRAUSS, LLP
613 Williamson St., Suite 201
Madison, Wisconsin 53703
(608) 237-1775
(608) 509-4423 (facsimile)
sam@turkestrauss.com

raina@turkestrauss.com

*Counsel for Plaintiffs and the Proposed Class*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing Plaintiff John Doe's Motion for Permission to Proceed Under Pseudonyms is being served alongside the Summons and Complaint to the Defendant:

Erlanger Health
National Registered Agents, Inc. 300 Montvue Road
Knoxville, TN 37919-5546
*Registered Agent for Defendant Erlanger Health*

J. Gerard Stranch, IV

# IN THE CHANCERY COURT FOR THE ELEVENTH JUDICIAL DISTRICT
## HAMILTON COUNTY, TENNESSEE

JANE DOE, JOHN DOE, JACK DOE,
and JANET DOE, individually, on
behalf of themselves, and all others
similarly situated,

        Plaintiffs,

v.

ERLANGER HEALTH d/b/a
ERLANGER HEALTH SYSTEM

        Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO. 23-0730

## AFFIDAVIT OF J. GERARD STRANCH, IV IN SUPPORT OF
## PLAINTIFF JOHN DOE'S MOTION FOR PERMISSION TO PROCEED UNDER A
## PSEUDONYM

I, J. GERARD STRANCH, IV, after having been duly sworn, state as follows:

1. I am over twenty-one (21) years of age.

2. I am competent to testify to the matters stated herein.

3. I have personal knowledge of the matters contained herein.

4. I am the managing partner of the law firm of Stranch, Jennings & Garvey, PLLC, headquartered in Nashville, Tennessee. My firm represents Plaintiff John Doe in this lawsuit.

5. I respectfully submit this Affidavit in support of Plaintiff John Doe's Motion to Proceed Under a Pseudonym.

6. Plaintiff John Doe is a citizen of Tennessee.

7. This case arises from the non-consensual intrusion into and disclosure of Plaintiff personal and private matters—namely their protected health information—by the Defendant.

8. Plaintiff desires to proceed under a pseudonym to protect his identity and medical information from further public disclosure, in the interest of preventing embarrassment and social

2023 NOV -1 AM 9:07

FILED
HAMILTON CO CLERK & MASTER

stigmatization and harm given the nature of the Complaint regarding the health, treatment, diagnoses, and care sought by Plaintiff.

9.     There is no public interest in the disclosure of Plaintiff's identity, and Plaintiff does not seek to seal this case, or shield facts from the public, but only to prevent disclosure of his actual name.

10.     Plaintiff will disclose his identity to the Court and to the Defendant.

11.     No prejudice will be caused to Defendant by the Court allowing Plaintiff to proceed pseudonymously.

*Further Affiant sayeth naught.*

J. Gerard Stranch, IV

State of Tennessee

County of Davidson

On this **3l** day of October 2023, before me personally appeared J. Gerard Stranch, IV to me known to be the person described in and who executed the foregoing instrument, and acknowledged that such person executed the same as such person free act and deed.

Witness my hand, at office, this **3l** day of **OCToBeR**, 20**23**.

Notary's Signature

My commission expires: **10/16/2024**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing Affidavit of J. Gerard Stranch, IV In

Support of Plaintiff John Doe's Motion for Permission to Proceed Under a Pseudonym is being

served alongside the Summons and Complaint to the Defendant:

Erlanger Health
National Registered Agents, Inc. 300 Montvue Road
Knoxville, TN 37919-5546
*Registered Agent for Defendant Erlanger Health*

J. Gerard Stranch. IV



## IN THE CHANCERY COURT FOR THE ELEVENTH JUDICIAL DISTRICT
## HAMILTON COUNTY, TENNESSEE

JANE DOE, JOHN DOE, JACK DOE, )
and JANET DOE, individually, on )
behalf of themselves, and all others )
similarly situated, )
            )
       **Plaintiffs,** )   CASE NO. __23-0730__
            )
**v.** )
            )
ERLANGER HEALTH d/b/a )
ERLANGER HEALTH SYSTEM )
            )
       **Defendant.**

## ORDER ALLOWING PLAINTIFF JOHN DOE TO PROCEED BY PSEUDONYMS

Plaintiff, by and through his counsel, filed this action on November 1, 2023 and filed a

motion for Plaintiff John Doe to proceed by pseudonym. Upon review of the motion, statements

of the parties, and the entire record in this case, the Court finds as follows:

1. This action involves highly private and sensitive facts related to the nature of the claims and the damages alleged, which include the disclosure of Plaintiff's health status, diagnoses and highly personal identify information;

2. Plaintiff faces embarrassment and harm if publicly identified as party to this action;

3. It is necessary to allow Plaintiff to proceed by pseudonym to protect his identity; and

4. There will be no prejudice to any party or public by allowing Plaintiff to proceed by pseudonym.

**IT IS THEREFORE ORDERED** that the Plaintiff be allowed to proceed by his

pseudonym, *to wit*: John Doe.

Entered this _____ day of _____, 2023.


                               _____
                               Judge

Approved for entry by:

J. Gerard Stranch, IV (#23045)
Andrew E. Mize (*Pro Hac Vice* forthcoming)
**STRANCH, JENNINGS & GARVEY, PLLC**
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203
(615) 254-8801
(615) 255-5419 (facsimile)
gstranch@stranchlaw.com
amize@stranchlaw.com

Lynn A. Toops (*Pro Hac Vice* forthcoming)
Mary Kate Dugan (*Pro Hac Vice* forthcoming)
**COHEN & MALAD, LLP**
One Indiana Square, Suite 1400
Indianapolis, Indiana 46204
(317) 636-6481
ltoops@cohenandmalad.com
MDugan@cohenandmalad.com

Samuel J. Strauss (*Pro Hac Vice* forthcoming)
Raina Borelli (*Pro Hac Vice* forthcoming)
**TURKE & STRAUSS, LLP**
613 Williamson St., Suite 201
Madison, Wisconsin 53703
(608) 237-1775
(608) 509-4423 (facsimile)
sam@turkestrauss.com
raina@turkestrauss.com

*Counsel for Plaintiff and the Proposed Class*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing (Proposed) Order Allowing Plaintiff

John Doe to Proceed by Pseudonym is being served alongside the Summons and Complaint to the

Defendant:

Erlanger Health
National Registered Agents, Inc.
300 Montvue Road
Knoxville, TN 37919-5546
*Registered Agent for Defendant Erlanger Health*

_____
J. Gerard Stranch. IV

# IN THE CHANCERY COURT FOR THE ELEVENTH JUDICIAL DISTRICT
## HAMILTON COUNTY, TENNESSEE

JANE DOE, JOHN DOE, JACK DOE,
and JANET DOE, individually, on
behalf of themselves, and all others
similarly situated,

Plaintiffs,

v.

ERLANGER HEALTH d/b/a
ERLANGER HEALTH SYSTEM

Defendant

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No: 23-0730

All Part 2 Motions will be heard either in person
or via WebEx beginning at 1:30 pm on NOVEMBER 13, 2023.
To participate by WebEx, the meeting ID # is 286561663.

## PLAINTIFF JACK DOE'S MOTION FOR PERMISSION

## TO PROCEED UNDER PSEUDONYM

Plaintiff, JACK DOE, individually, on behalf of themselves, and all others similarly

situated, by and through counsel, respectfully moves the Court to proceed pseudonyms, stating as

follows:

1.    This case arises from the non-consensual intrusion into and disclosure of Plaintiff's

personal and private matters – namely their protected health information.

2.    Plaintiff requests permission to proceed under a pseudonym to protect his identity

and his medical information from further public disclosure.

3.    Plaintiff also moves the court to order Defendant to maintain the confidentiality of

his identity by using only pseudonyms in all of its filings, including all exhibits in which his name

appears.

4.    Plaintiff JACK DOE is an adult male citizen of Tennessee.

5.    The Complaint ("Complaint") was filed on November 1, 2023.

6.    Plaintiff will disclose his identity to the Court and Defendant,

2023 NOV -1 AH 9:07

FILED
HAMILTON CO CLERK & MASTER

7.     As a result of the nature of the claims of this case and the damages alleged, this case necessarily involves the filing and disclosure of Plaintiff's health status, diagnoses and seeking medical treatment.

8.     Plaintiff used a pseudonym to protect his identity from being released due to the highly personal and potentially stigmatizing medical information in this action, and the desire to prevent his private personal medical information from being spread further.

9.     There are several factors which weigh in favor of allowing Plaintiff to proceed pseudonymously and entering an order that all parties use Plaintiff's pseudonym in all documents.

10.     The first is the potential for embarrassment and social stigmatization given the nature of the Complaint regarding the health, treatment, diagnoses, and care sought by Plaintiff.

11.     Moreover, Plaintiff's claims are an intrusion upon seclusion into Plaintiff's private and personal affairs. By allowing Plaintiff to proceed pseudonymously, Plaintiff seeks to limit their damages further, by limiting, to the extent possible, the necessity of their names on public dockets and filings with their medical records.

12.     Additionally, there is a lack of any prejudice to Defendant, actual or otherwise. Courts routinely enter orders protecting the personal medical information of parties which include forbidding the disclosure of identifiable personal information or personal identifiable information.

13.     Plaintiff does not seek to seal the case, nor does he desire the facts to be shielded from the public eye — Plaintiff merely seeks to prevent the disclosure of his actual name as part of a public record.

14.     There is no public interest in the disclosure of the Plaintiff's identity.

15.	For the reasons stated above, Plaintiff seeks an order requesting permission to proceed under a pseudonym to protect his identity from public disclosure. As stated, Plaintiff will disclose his identity to the Court and the Defendant.

16.	Plaintiff also moves the court to order Defendant to maintain the confidentiality of his identity by using only a pseudonym in all of its filings, including all exhibits in which their name appears.

17.	The Affidavit of Plaintiff's Counsel is attached to this Motion.

Dated: October 31, 2023

Respectfully submitted,

J. Gerard Stranch, IV (BPR No. 023045)
Andrew E. Mize (*Pro Hac Vice* forthcoming)
STRANCH, JENNINGS & GARVEY, PLLC
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203
(615) 254-8801
(615) 255-5419 (facsimile)
gstranch@stranchlaw.com
amize@stranchlaw.com

Lynn A. Toops (Pro Hac Vice forthcoming)
Mary Kate Dugan (Pro Hac Vice forthcoming)
COHEN & MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, Indiana 46204
(317) 636-6481
ltoops@cohenandmalad.com
mdugan@cohenandmalad.com

Samuel J. Strauss (*Pro Hac Vice* forthcoming)
Raina Borelli (*Pro Hac Vice* forthcoming)
TURKE & STRAUSS, LLP
613 Williamson St., Suite 201
Madison, Wisconsin 53703
(608) 237-1775
(608) 509-4423 (facsimile)
sam@turkestrauss.com

raina@turkestrauss.com

*Counsel for Plaintiffs and the Proposed Class*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing Plaintiff Jack Doe's Motion for Permission to Proceed Under Pseudonyms is being served alongside the Summons and Complaint to the Defendant:

Erlanger Health
National Registered Agents, Inc. 300 Montvue Road
Knoxville, TN 37919-5546
*Registered Agent for Defendant Erlanger Health*

J. Gerard Stranch, IV

# IN THE CHANCERY COURT FOR THE ELEVENTH JUDICIAL DISTRICT
## HAMILTON COUNTY, TENNESSEE

JANE DOE, JOHN DOE, JACK DOE, and JANET DOE, individually, on behalf of themselves, and all others similarly situated,

        Plaintiffs,

v.

ERLANGER HEALTH d/b/a
ERLANGER HEALTH SYSTEM

        Defendant.

CASE NO. 23-0730

## AFFIDAVIT OF J. GERARD STRANCH, IV IN SUPPORT OF PLAINTIFF JACK DOE'S MOTION FOR PERMISSION TO PROCEED UNDER A PSEUDONYM

I, J. GERARD STRANCH, IV, after having been duly sworn, state as follows:

1. I am over twenty-one (21) years of age.

2. I am competent to testify to the matters stated herein.

3. I have personal knowledge of the matters contained herein.

4. I am the managing partner of the law firm of Stranch, Jennings & Garvey, PLLC, headquartered in Nashville, Tennessee. My firm represents Plaintiff Jack Doe in this lawsuit.

5. I respectfully submit this Affidavit in support of the Plaintiff Jack Doe's Motion to Proceed Under a Pseudonym.

6. Plaintiff Jack Doe is a citizen of Tennessee.

7. This case arises from the non-consensual intrusion into and disclosure of Plaintiff personal and private matters—namely their protected health information—by the Defendant.

8. Plaintiff desires to proceed under a pseudonym to protect his identity and medical information from further public disclosure, in the interest of preventing embarrassment and social

2023 NOV -1 AM 9:07

FILED
HAMILTON CO CLERK & MASTER

stigmatization and harm given the nature of the Complaint regarding the health, treatment, diagnoses, and care sought by Plaintiff.

9. There is no public interest in the disclosure of Plaintiff's identity, and Plaintiff does not seek to seal this case, or shield facts from the public, but only to prevent disclosure of his actual name.

10. Plaintiff will disclose his identity to the Court and to the Defendant.

11. No prejudice will be caused to Defendant by the Court allowing Plaintiff to proceed pseudonymously.

*Further Affiant sayeth naught.*

_____
J. Gerard Stranch, IV

State of Tennessee

County of Davidson

On this **31** day of October 2023, before me personally appeared J. Gerard Stranch, IV to me known to be the person described in and who executed the foregoing instrument, and acknowledged that such person executed the same as such person free act and deed.

Witness my hand, at office, this **31** day of **OCTOBER**, 20**23**.

_____
Notary's Signature

Seal

My commission expires: **10/16/2024**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing Affidavit of J. Gerard Stranch, IV In

Support of Plaintiff Jack Doe's Motion for Permission to Proceed Under a Pseudonym is being

served alongside the Summons and Complaint to the Defendant:

Erlanger Health
National Registered Agents, Inc. 300 Montvue Road
Knoxville, TN 37919-5546
*Registered Agent for Defendant Erlanger Health*

J. Gerard Stranch. IV



RECEIVED
11-1-2023
Clerk & Master

**IN THE CHANCERY COURT FOR THE ELEVENTH JUDICIAL DISTRICT
HAMILTON COUNTY, TENNESSEE**

| | | |
|---|---|---|
| JANE DOE, JOHN DOE, JACK DOE, and JANET DOE, individually, on behalf of themselves, and all others similarly situated, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | CASE NO. 23-0730 |
| v. | ) ) | |
| ERLANGER HEALTH d/b/a ERLANGER HEALTH SYSTEM | ) ) ) | |
| Defendant. | ) | |

## ORDER ALLOWING PLAINTIFF JACK DOE TO PROCEED BY PSEUDONYM

Plaintiff, by and through his counsel, filed this action on November 1, 2023 and filed a motion for the Plaintiff to proceed by pseudonym. Upon review of the motion, statements of the parties, and the entire record in this case, the Court finds as follows:

1. This action involves highly private and sensitive facts related to the nature of the claims and the damages alleged, which include the disclosure of Plaintiff's health status, diagnoses and highly personal identify information;

2. Plaintiff faces embarrassment and harm if publicly identified as party to this action;

3. It is necessary to allow Plaintiff to proceed by pseudonym to protect his identity; and

4. There will be no prejudice to any party or public by allowing Plaintiff to proceed by pseudonym.

**IT IS THEREFORE ORDERED** that the Plaintiff be allowed to proceed by his pseudonym, *to wit*: Jack Doe.

Entered this _____ day of _____, 2023.

_____
Judge

Approved for entry by:

_J. Gerard Stranch, IV (#23045)_
Andrew E. Mize (*Pro Hac Vice* forthcoming)
**STRANCH, JENNINGS & GARVEY, PLLC**
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203
(615) 254-8801
(615) 255-5419 (facsimile)
gstranch@stranchlaw.com
amize@stranchlaw.com

Lynn A. Toops (*Pro Hac Vice* forthcoming)
Mary Kate Dugan (*Pro Hac Vice* forthcoming)
**COHEN & MALAD, LLP**
One Indiana Square, Suite 1400
Indianapolis, Indiana 46204
(317) 636-6481
ltoops@cohenandmalad.com
MDugan@cohenandmalad.com

Samuel J. Strauss (*Pro Hac Vice* forthcoming)
Raina Borelli (*Pro Hac Vice* forthcoming)
**TURKE & STRAUSS, LLP**
613 Williamson St., Suite 201
Madison, Wisconsin 53703
(608) 237-1775
(608) 509-4423 (facsimile)
sam@turkestrauss.com
raina@turkestrauss.com

*Counsel for Plaintiff and the Proposed Class*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing (Proposed) Order Allowing Plaintiff

Jack Doe to Proceed by Pseudonym is being served alongside the Summons and Complaint to the

Defendant:

Erlanger Health
National Registered Agents, Inc. 300 Montvue Road
Knoxville, TN 37919-5546
*Registered Agent for Defendant Erlanger Health*

J. Gerard Stranch. IV

Jane Doe, John Doe, Jack Doe, and Janet Doe, individually,

on behalf of themselves, and all others similarly situated

Plaintiff(s)

v.

Case No. 23-0730

**Erlanger Health d/b/a**

**Erlanger Health System**

Defendant(s)

## COST BOND

I (We), **Jane Doe, John Doe, Jack Doe, and Janet Doe**, as Principal(s), and **Stranch, Jennings & Garvey, PLLC**,

as Surety, are held and firmly bound unto the Clerk and Master of Hamilton County Chancery Court for the payment of all costs awarded against the Principal(s). To that end, we bind ourselves, our heirs, executors and administrators.

The Principal(s) is/are commencing legal proceedings in the Chancery Division or Probate Division of Hamilton County Chancery Court. If the Principal(s) shall pay all costs adjudged against them, then this obligation is void. If the Principal(s) fail to pay such costs, then the Surety shall undertake to pay all costs adjudged against the Principal(s). Mandated at T.C.A. § 20-12-120 *et seq.*

### PRINCIPAL(S)

| | |
|---|---|
| (Print or Type)   Principal | (Print or Type)   Principal |
| Social Security Number: | Social Security Number: |
| Address: | Address: |
| Employer: | Employer: |
| Employer's Address: | Employer's Address: |
| Signature of Principal | Signature of Principal |

### SURETY

**J. Gerard Stranch, IV**

(Print or Type)   Surety

Address: **Stranch, Jennings & Garvey, PLLC**

223 Rosa L. Parks Ave, Suite 200, Nashville, TN, 37203

Signature of Surety

2023 NOV -1 AM 8: 58

FILED
HAMILTON CO CLERK & MASTER

# State of Tennessee
## IN THE CHANCERY COURT FOR HAMILTON COUNTY

Jane Doe, John Doe, Jack Doe, and Janet Doe,
individually, on behalf of themselves, and all
others similarly situated

**PLAINTIFFS**

VS.

**DOCKET NO. 23-0730**

Part 2

Erlanger Health d/b/a Erlanger Health Systems

**DEFENDANT**

## SUMMONS

TO DEFENDANT: _____ Erlanger Health d/b/a Erlanger Health System _____

WHOSE ADDRESS IS _____ Serve Registered Agent _____

_____ National Registered Agents, Inc., 300 Montvue Road, Knoxville, TN 37919-5546 _____

OTHER SERVICE INFORMATION _____ Serve via certified mail _____

You are summoned and required to Answer and make defense to a Complaint herewith served upon you. Your Answer to the Complaint must be filed and served upon plaintiff's attorney on or before thirty (30) days after service of this Summons and Complaint upon you, exclusive of the day of service. Your Answer must be filed in the OFFICE OF THE CLERK & MASTER, 625 Georgia Avenue, Room 300 Courthouse, Chattanooga, Tennessee 37402. You are also required to serve a copy of your Answer upon the plaintiff's attorney, or the *pro se* plaintiff as set out below. If you fail to do so, judgment by default will be taken against you for the relief demanded in the Complaint.

**ISSUED & ATTESTED** this 1 day of November, 20 23.

**ROBIN L. MILLER, CLERK & MASTER**

By: _____

**DEPUTY CLERK & MASTER**

| | |
|---|---|
| J. Gerard Stranch, IV | 23045 |
| Plaintiff's Attorney or Plaintiff if no attorney (*pro se*) | BPR# |
| Stranch, Jennings & Garvey PLLC. Address | |
| 223 Rosa L. Parks Ave. | |
| Nashville, TN 37203 | |
| (615) 254-8801 | (615) 255-5419 |
| Tel. No. | Fax No. |

**2023 NOV 16 AM 10: 24**

**FILED**
**HAMILTON CO CLERK & MASTER**

**NOTICE TO DEFENDANT(S)**

Tennessee Code Annotated § 26-2-103 provides a $10,000.00 personal property exemption from execution or seizure to satisfy a judgment. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the Clerk & Master. The list may be filed at any time and may be changed by you thereafter as necessary; however unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for yourself and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you, would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer.

# SUMMONS RETURN

I received this summons on __11/02/2023__ . I certify and return that on __11/02/2023__ , I
(Date)                                                   (Date)

☑ served this summons and a complaint on defendant, __Erlanger Health   d/b/a Erlanger Health System__
(Printed Name of Defendant)

in the following manner:

__Via  Certified Mail  to  Registered  Agent:__
__National Registered Agents,  Inc.__
__300  Montvue  Rd.  Knoxville, TN  37919 - 5546__

☐ failed to serve this summons within ninety (90) days after its issuance because:

_____

_____

_____


__Heather Corder, Paralegal__ _(signature)_
Process Server Name (Printed)                   Process Server Signature

__Stranch, Jennings, & Garvey PLLC__
Address
__223  Rosa L. Parks Ave. Suite 200__
__Nashville, TN  37203__

SENDER: *COMPLETE THIS SECTION*

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

National Registered Agents, Inc
300 Montvue Road
knoxville, TN 37919-5546

9590 9402 8547 3186 9780 26

2. Article Number *(Transfer from service label)*

9589 0710 5270 1583 5531 71

COMPLETE THIS SECTION ON DELIVERY

A. Signature

X _____ ☐ Agent
☐ Address

B. Received by *(Printed Name)* — Samantha Sutton

C. Date of Deliv

D. Is delivery address different from item 1? ☐ Yes
   If YES, enter delivery address below: ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☑ Certified Mail® - Return Recpt.
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
   Mail Restricted Delivery
   )0)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restri
   Delivery
☐ Signature Confirmatio
☐ Signature Confirmatio
   Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053          Domestic Return Recei

2023 NOV 16 AM 10: 24

FILED
HAMILTON CO CLERK & MASTER